RONALD KLAWITTER AND ANOTHER, d.b.a.
HECTOR REALTY, v.
CHARLES F. BILLICK AND ANOTHER.

242 N. W. 2d 588.

May 7, 1976—No. 45079.

326

*Wurm & Selander* and *R. D. Selander,* for appellants.

*Hulstrand, Anderson & Larson* and *L. Wayne Larson,* for respondents.

*Robins, Davis & Lyons* and *James R. Safley,* for Minnesota Association of Realtors, amicus curiae, seeking reversal.

TODD, JUSTICE.

Plaintiffs appeal from the judgment of the trial court that they are not entitled to receive a real estate commission for pro-

ducing a buyer for defendants' farm. Plaintiffs had an exclusive listing agreement which defendants terminated prior to its expiration date. We reverse and remand.

Defendants are the owners of two tracts of farmland in southern Minnesota, consisting of a total of 960 acres, 888 of which are tillable. On February 17, 1973, defendants signed an "EXCLUSIVE RIGHT TO SELL LISTING AGREEMENT" with plaintiffs, Ronald Klawitter and Raymond Christensen, doing business as Hector Realty. This agreement gave Hector Realty the exclusive right to sell defendants' farmland until April 15, 1974, for a price of $410,000 (or $420,000 if the sale occurred after May 1, 1973). The terms of sale provided for a sale by contract for deed with an interest rate of 7 percent.[1] Defendants agreed to pay plaintiffs a 5-percent commission on the sale.

Plaintiffs commenced efforts to sell defendants' farm, placing ads in a Minneapolis paper, and also contacting people orally and by telephone. On August 1, 1973, plaintiffs received a visit from defendant Charles F. Billick, who told plaintiff Klawitter that he wanted to "withdraw or increase the price" on the listing agreement for the reasons that he was contracting for farm improvements which would cost about $20,000, and that he believed the value of his property had increased since the date the agreement was entered into. Billick testified that he desired to raise the price of his tillable land to $500 per acre, plus the cost of his improvements, and that, based on plaintiff Klawitter's assurance that any further negotiations about the farm sale would include the increased land price and the improvements on the property, he agreed to abide by the listing agreement for 30 days.

Following the August 1 meeting, plaintiffs contacted Virgil Mellies[2] and a purchase agreement was prepared and signed by Mellies providing for a purchase price of $420,000 and an inter-

---

[1] There was some dispute as to the interest rate agreed upon, but we find that the evidence establishes that the agreed rate was 7 percent.

[2] Mellies had earlier submitted an offer of $400,000, which was rejected by defendants.

est rate of 6 1/2 percent. Plaintiffs understood this agreement to reflect the original terms of the listing agreement. The agreement signed by Mellies was forwarded to defendants. On August 12, 1973, defendant Charles Billick wrote plaintiffs to formally notify them of the termination of the February 17, 1973, listing agreement—a termination which he had allegedly verbally requested on August 1. He also rejected the August 7 purchase agreement. The letter pointed out that the purchase agreement failed to reflect either the agreed-on increase in price per acre or the cost of improvements. Further, the letter pointed out that the interest rate did not comply with the rate of 7 percent, which Billick understood had been agreed upon. Upon being informed of this rejection of his purchase agreement, Mellies agreed to increase the rate of interest and initialed the change on the August 7 agreement. Klawitter mailed the revised agreement to defendants, who received it on August 17, 1973, but never signed it. On September 25, 1973, defendants received a third purchase agreement signed by Mellies dated September 19, 1973, showing a $444,000 purchase price and a 7-percent interest rate. This price represented the requested $500 per tillable acre, but nothing for the improvements, since Mellies was not interested in purchasing them. Mellies testified that he agreed to the increased price due to increased land values and higher grain prices. Defendants also refused to sign this purchase agreement, contending that they had canceled the listing agreement.

Plaintiffs instituted this action to recover their 5-percent commission, as provided in the listing agreement, based on a sale price of $420,000, and specifically rejected any possible recovery on a quantum meruit theory. The lower court concluded as a matter of law that defendants had a unilateral right to modify the terms of sale prior to sale; that such a modification had occurred on August 1, 1973; that the purchase agreement of August 7 did not conform to the listing agreement as modified; that defendants had the *power* to terminate the agreement with or without cause, and the *right* to terminate for cause; that the

placement of improvements and increase in land values con-stituted sufficient cause; that the letter of August 12, 1973, ter-minated plaintiffs' agency; that plaintiffs had no power to nego-tiate for defendants thereafter; and that purchase agreements obtained after the termination were without effect. Accordingly, judgment was entered for defendants.

The issues presented on appeal are whether a seller under an exclusive listing agreement for a definite period may modify the terms of the listing or withdraw the property from the market prior to the agreed expiration date, and what damages, if any, shall be recoverable by the broker.

■ In resolving this matter, certain basic principles must be recognized. First and foremost, the broker is the agent of the seller and his duties, obligations, and rights are cast within that relationship. Olson v. Penkert, 252 Minn. 334, 341, 90 N. W. 2d 193, 199 (1958). As an agent, the broker is under a duty not to act except in accordance with the principal's directions and only for so long as the principal's manifestation of consent continues. Restatement, Agency 2d, §§ 119, 383, 385, 386. The broker is also under a duty to be loyal to the principal's interests and to obtain terms which satisfy the manifested purposes of the principal. Restatement, Agency 2d, § 424. On the other hand, where the principal terminates or repudiates the agent's employment in violation of the contract of employment and without cause, or where the agent properly terminates because of the principal's breach, the agent is entitled to receive either (a) the amount of net losses caused and gains prevented by the breach, or (b) the reasonable value of the services rendered. Restatement, Agency 2d, §§ 450, 455, 118, Comment *c*. The authorities dis-tinguish between the power to revoke and the right to revoke. Restatement, Agency 2d, § 118, Comment *b*, provides:

*"Power to revoke or renounce.* The principal has power to revoke and the agent has power to renounce, although doing so is in violation of a contract between the parties and although the

authority is expressed to be irrevocable. A statement in a contract that the authority cannot be terminated by either party is effective only to create liability for its wrongful termination."

Exercise of the power of revocation where no corresponding right exists exposes the actor to liability. Restatement, Agency 2d, § 18, Comment *c*, states in part:

"*Liabilities.* If there is a contract between principal and agent that the authority shall not be revoked or renounced, a party who revokes or renounces, unless privileged by the conduct of the other or by supervening circumstances, is subject to liability to the other."

See, Olson v. Penkert, *supra.*

■ The trial court ruled that the listing agreement of February 17, 1973, was a valid and enforceable contract. That conclusion correctly followed from our decisions in Lapham v. Flint, 86 Minn. 376, 90 N. W. 780 (1902), and Confer Brothers, Inc. v. Colbrath, 149 Minn. 259, 183 N. W. 524 (1921), holding that a broker's expenditure of time or money to find a purchaser is sufficient consideration for the promise to pay a commission and makes the agreement bilateral and binding. Plaintiffs' part performance here was sufficient to bring the February 17, 1973, listing agreement within this rule.

■ Since the listing agreement was an enforceable bilateral contract, it follows that the defendants did not have a unilateral right modify its terms. Although a mere executory agreement between principal and broker, terminable at the broker's will, may be unilaterally modified by the principal without giving rise to any liability, the rule is the opposite once the broker undertakes his performance. See 12 Am. Jur. 2d, Brokers, § 35, which states:

"* * * Where, however, there is such a mutuality or reciprocity of consideration as to deprive the principal of the absolute right of determining the contract, or as to make the contract mutually obligatory, there can be no valid modification of it

without some consideration moving to the party who would be adversely affected."

The rule regarding a principal's unilateral modification of the terms of a bilateral listing agreement is the same as that regarding his renunciation of such an agreement as discussed above: While the principal possesses the *power* to make such a unilateral modification, he has no *right* to do so and is liable to his agent for any damages incurred as a result of such wrongful modification. 1 Mechem, Agency (2 ed.) § 1536, note 68.

■ Billick's actions on August 1, 1973, constituted a unilateral modification of the original listing agreement. The evidence clearly establishes that Billick insisted on August 1 that the price per tillable acre be raised, that he be reimbursed for improvements, and that plaintiffs' authority to sell upon those terms extend only 30 days. In negotiating the August 7 purchase agreement, Klawitter told Mellies that he had a 30-day deadline in which to sell the property. There is some evidence which would permit plaintiffs to claim that the 30-day limit applied only to the original terms, but the weight of the evidence, considering all of the events after August 1, 1973, supports the conclusion that plaintiffs knew that the original listing had been modified and as modified was to remain in effect for only 30 days, i. e., until the end of August 1973.

Since defendants retained the power to thus modify the terms of the agency agreement, plaintiffs were bound by the modification and no longer had any authority to act under the original agreement. On the other hand, since defendants did not have the right to make this modification, plaintiffs are entitled to damages for any loss suffered as a result of the modification, and such loss must be measured in light of the circumstances on the date of the modification.

■ In some circumstances a principal may escape liability for his unilateral modification or renunciation of a listing agreement if his action was not "arbitrary" or in "bad faith"—e. g.,

for the purpose of depriving the broker of his commission—but, rather, is based on a "reasonable cause." 12 Am. Jur. 2d, Brokers, § 199; 3A Dunnell, Dig. (3 ed.) § 1147; Olson v. Penkert, *supra*. The court below held that the increased value of defendants' land and the improvements for which defendants were contracting constituted "sufficient cause" to exempt them from liability for terminating the agreement. Based on the evidence herein, we find this conclusion to be erroneous as to the increased value of the land. We do not pass on the effect of the improvements because the record does not contain the evidence necessary to do so.

The trial court found that defendants' reason for not accepting any of the purchase agreements was their decision not to sell the land at all, and, as of the date of trial, the land still had not been sold. An owner's change of mind regarding the sale of property with respect to which a listing agreement has been executed does not constitute reasonable cause for revocation. McDonald v. Davis, 389 S. W. 2d 494 (Tex. Civ. App. 1965) ; John L. Rowan & Co. v. Hull, 55 W. Va. 335, 47 S. E. 92 (1904).

Applying the legal principles enunciated herein to the particular facts of this case, we conclude on the record before us:

(1) On August 1, Billick without cause modified plaintiffs' exclusive listing agreement. Therefore, plaintiffs had a valid claim against defendants for either (a) the amount of net losses caused and gains prevented by the breach, or (b) for the reasonable value of their services. However, plaintiffs explicitly waived their claim to recover on the latter theory.

(2) Plaintiffs had no authority to continue to offer the property for sale after August 1 under the terms of the original listing. However, they did have authority for 30 days to offer the property under the modified terms.

(3) The cancellation of the modified agreement by Billick on August 12 subjected defendants to a new claim for damages as to the modified agreement in the same manner as provided in paragraph (1), *supra*.

(4) Since plaintiffs never tendered an agreement conforming to the modified listing within the time limits thereof, plaintiffs suffered no loss of profits as a result of the August 12 revocation. Therefore, plaintiffs cannot recover any damages at all on account of this cancellation, since they expressly waived their claim for recovery on the theory of quantum meruit.

In accordance with these conclusions, this case will be remanded for a determination as to plaintiffs' damages pursuant to the theory stated in (1)(a) above. Where, as here, suit is for breach of a contract granting the agent the exclusive right for a definite period of time to sell property, the damages are for breach of contract and not for the commission promised the agent if he made a sale conforming to the listing terms. See, McDonald v. Davis, 389 S. W. 2d 494 (Tex. Civ. App. 1965); 1 Mechem, Agency (2 ed.) § 1552. As the latter well-respected authority on agency law explains:

"Where an agent has been employed to do some particular act * * * for the doing of which he is to receive a commission * * * under such circumstances as to involve a contract * * * to perform, and he is wrongfully prevented from performing by the principal, his remedy must ordinarily be an action for damages. * * * He cannot ordinarily recover the agreed commission, because this was to be paid only upon performance, and, by the hypothesis, this has been prevented by the wrongful act of the principal. There may, of course, be cases * * * in which he has so substantially and practically performed before the breach, that he may recover upon that theory. In other cases, however, the agent's recovery must be had upon some different basis. He would, in any event, be entitled * * * in cases in which the damages could be estimated with the necessary certainty, to compensation for the loss of what he would have received had he been permitted to perform his undertaking."

Plaintiffs should therefore be permitted to introduce evidence as to reasonable likelihood of their ability to produce a buyer

under the original terms, as we have construed them, prior to the expiration date set for the February 17, 1973, listing. In particular, Minnesota precedents establish this right to introduce "evidence of sales made * * * within the unexpired period * * * upon proper caution [to the jury] by the court to avoid excess or speculation * * * ." Emerson v. Pacific Coast & Norway Packing Co. 96 Minn. 1, 6, 104 N. W. 573, 575 (1905).

Further, since the matter is being remanded for a new trial, defendants are not precluded from offering evidence as to the reasonable necessity for making improvements during the term of the listing and the purported refusal of the broker to add the cost thereof to the listing agreement. This evidence can be considered in determining whether or not cause existed to modify the agreement as of August 1, 1972.

Reversed and remanded for a new trial.