CRI, INC., Appellee,

v.

Frederick O. WATSON, Appellant,

Northland Investment Company, Appellee.

CRI, INC., Appellee,

v.

Frederick O. WATSON, Appellant,

v.

NORTHLAND INVESTMENT COMPANY, Appellee.

Nos. 78–1751, 79–1129.

United States Court of Appeals, Eighth Circuit.

Submitted April 19, 1979.

Decided Nov. 5, 1979.

John M. Mason, Dorsey, Windhorst, Hannaford, Whitney & Halladay, Minneapolis, Minn., for appellant.

Charles Quaintance, Jr., Maslon, Kaplan, Edelman, Borman, Brand & McNulty, Minneapolis, Minn., for appellee CRI.

Lawrence J. Hayes, Maun, Green, Hayes, Simon, Aretz & Murray, St. Paul, Minn., for appellees CRI and Northland Investment Company.

Before LAY, HEANEY and McMILLIAN, Circuit Judges.

LAY, Circuit Judge.

Frederick O. Watson appeals judgments in favor of Capital Realty Investments, Inc., (CRI) and Northland Investment Company (Northland) for compensatory damages and prejudgment interest, which arose out of Watson's breach of an exclusive agency agreement.

The agreement concerned sale of an equity interest in a limited partnership that owned a major regional shopping center, Valley West, which was under construction during the time in question. Watson entered negotiations with Northland, a mortgage brokerage firm, to secure additional financing. Northland suggested equity financing, sale of an ownership interest and disproportionate tax losses, in addition to debt financing. It drew up an investment proposal and introduced Watson to CRI, a firm in the business of finding real estate investments for its investor-customers. While negotiating with CRI, Watson was simultaneously negotiating through Heitman Mortgage Company sale of a 50% ownership interest in Valley West for $3,500,-000: an equity investment of $100,000 and a second mortgage loan of $3,400,000. On September 18, 1975, Watson signed a contract prepared by Northland that gave CRI the exclusive right between September 18 and November 1, 1975, to produce and show evidence of a corporate buyer who would purchase an 11% interest and 80% of the project's tax losses through 1977 and 11% of certain other assets for a price of $525,000. The agreement was subject to the condition that a "bankable written commitment obtained by Heitman Mortgage for a $3,400,000, 9¾%, 50 year term, self-amortizing second mortgage and a $100,000 equity investment for purchase of 50% of the partnership's interest in the subject property" be delivered and accepted in writing by Watson. Watson agreed in the contract to pay Northland a fee of $40,000 at the initial closing.

The lower court found Watson notified Northland he was not going to go through with the contract on October 6, 1975, and did so for the sole reason that he hoped to obtain greater profit elsewhere.[1] Because Watson's repudiation made CRI's performance impossible, even though CRI was ready and willing to perform, the court awarded CRI damages in the amount of profit it would have realized had the sale to CRI's prospective purchasers gone through, $125,000. It found Northland lost the benefit of its bargain to receive the $40,000 fee specified in the contract and awarded it that amount in damages.

---

1. The case was tried, by stipulation, to a magistrate; the district court adopted his findings and accepted his recommendation.

## I. *Jurisdiction.*

■ Watson argues Northland's intervention in the lawsuit as of right destroyed diversity of citizenship jurisdiction, because Northland and Watson are both Minnesota citizens. Northland clearly had sufficient interest in the suit and risked sufficient impairment of that interest to intervene as of right under Rule 24(a)(2) of the Federal Rules of Civil Procedure, and Watson does not argue otherwise.[2] Its position, therefore, was comparable to that of a party to be joined if feasible under Rule 19(a)(2)(i). Notes of Advisory Committee on Rules, 1966 amendment, Rule 24, 28 U.S.C.A.; 7A C. Wright and A. Miller, Federal Practice and Procedure § 1917 at 604 and n. 73 (1972); *see Smuck v. Hobson,* 132 U.S.App. D.C. 372, 375, 408 F.2d 175, 178 (D.C.Cir. 1969). Since Northland was a party whose presence was desirable but would deprive the court of jurisdiction, the question was whether "in equity and good conscience" the action should have proceeded among the parties before the court or be dismissed because Northland was indispensable. Fed. R.Civ.P. 19(b).

■ CRI's suit for damages was based upon its exclusive right to find a buyer within the time period, have Watson consummate the sale, and make a profit from the difference between sale price and Watson's price. Northland's duties were distinct from CRI's. Northland's former assistant vice president, Luxem, testified that after he met several times with Watson and CRI representatives and prepared the September 18th agreement, his performance was complete.[3] Northland had substantially and practically performed prior to Watson's repudiation and had earned the $40,000 fee, which was intended to be entirely its own. Thus, its right to the fee, although contingent on CRI's performance, was sufficiently distinct to justify enforcement in a separate action from CRI's suit for its lost profits. *Cf. Fremon v. W. A. Sheaffer Pen Co.,* 209 F.2d 627, 633–34 (8th Cir. 1954); *Bry-Man's, Inc. v. Stute,* 312 F.2d 585 (5th Cir. 1968) (one fee split). Because Northland's rights and obligations could not be determined if it were not a party to the action, or privy to a party, the only prejudice it would risk would be that of adverse precedent, which is not the type of prejudice contemplated by Rule 19(b). *See Helzberg's v. Valley West Des Moines Shopping Center, Inc.,* 564 F.2d 816, 819 (8th Cir. 1977). A separate and adequate judgment could be awarded CRI in Northland's absence. We conclude Northland was not indispensable to the action; its presence by intervention therefore did not divest the court of jurisdiction.

## II. *District Court Findings—Clearly Erroneous Rule.*

■ Watson argues alternatively that CRI is precluded from recovering damages

---

**2.** It is clear from the contract that Northland's receipt of its fee was contingent upon CRI's success in finding a buyer. Thus, Northland had an interest in the contract and in CRI's performance and action for breach. It also risked, as a practical matter, impairment of its ability to protect its interest by disposition of the suit in its absence. Even though Northland would not have been bound if it were not a party, judgment in Watson's favor would clearly have been compelling precedent adverse to its own cause of action. *See Babcock & Wilcox Co. v. Parsons Corp.,* 430 F.2d 531, 541–42 (8th Cir. 1970); *Blake v. Pallan,* 554 F.2d 947, 954 (9th Cir. 1977); *Francis v. Chamber of Commerce,* 481 F.2d 192, 195 n. 8 (4th Cir. 1973); *Martin v. Travelers Indem. Co.,* 450 F.2d 542 (5th Cir. 1971); *Nuesse v. Camp,* 128 U.S. App.D.C. 172, 179–80, 385 F.2d 694, 701–02 (D.C.Cir.1967). Northland's legal position in establishing the commission as the measure of its damages was unique to it and satisfied the requirement of a "minimal" showing of inadequate representation by other parties. *Trbovich v. United Mine Workers,* 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972).

**3.** Luxem gave the following testimony:

A. Well, at that point my role ceased. I had no further responsibilities. I had brought the parties together, screened the transaction, underwritten it, provided all the documentation. I had put together an agreement that had been signed. Northland had accepted the reduced fee. I cleared that with the people there, and it was now CRI's responsibility to perform as Fred had expected them to. I had no further involvement except if somebody was to contact me or ask me to deliver a copy or get some additional information that would be required to close.

because its fiduciary role as agent precluded "secret profits." The premise, that CRI's profit was secret or from a collateral sale, is fallacious; the court found Watson "expected CRI to sell the interest for substantially in excess of $525,000, the excess constituting CRI's fee." It stated that although Watson testified CRI did not inform him of the amount of its expected profit, he did not ask, did not want to pay CRI a fee himself, was happy to leave the fee arrangement up to CRI and the prospective purchaser, and clearly did not believe CRI was operating without expectation of profit. These findings rested upon credibility determinations and are not clearly erroneous.

Watson also argues his performance was excused because two conditions were not met: (1) a bankable commitment from Heitman Mortgage Company was not delivered or accepted; and (2) CRI did not find a corporate buyer.

■ The court concluded Watson's written acceptance of a proposal embodying the essential terms of the Heitman proposal as described in the September 18th agreement was a condition precedent to Watson's performance, but also concluded the condition was met or excused by Watson's unjustified repudiation. It was met by Watson's acceptance of a Heitman proposal identical to that described in the September 18th agreement except for an immaterial alteration in price.[4] It was excused to the extent it was not met, because Watson repudiated the September 18th agreement solely to receive greater profit elsewhere, a repudiation found unjustified, arbitrary and in bad faith.

Watson argues rules about conditions precedent should not apply, because the contract gave him a right to reject the Heitman deal and therefore the entire contract, by the literal language: "and written acceptance by you."[5]

The court's finding that Watson did not reject the Heitman proposal, because the proposal he renegotiated was substantially the same as the one contemplated by the September 18th agreement, is supported by the record. Luxem testified that because the CRI and Heitman sales were complementary parts of a financing package, the condition was drafted to provide the CRI deal was off if Heitman could not secure its client's consent to the second mortgage— equity interest purchase deal, and that he understood Heitman's fee and the other figures were not final. The Heitman sale price, $3,900,000, was not much greater than the price in the September 18th contract, $3,500,000, when one considers Heitman's $300,000 fee was mentioned apart from the price in an earlier proposal but was not mentioned in the second proposal. The finding that Watson repudiated solely to obtain greater profit in the tax loss sale is supported both by Watson's own testimony that he sought more money and his later, more profitable sale to Edidin.

■ In light of these findings, Watson is reduced to arguing the contract gave him a right to reject on whim, a right unlimited by requirements of good faith or fair dealing. Apart from construction of this specific contract provision, under common law principles of agency a principal is generally liable for arbitrary or bad faith renunciation of an agreement. *See Klawitter v. Billick*, 308 Minn. 325, 331–32, 242 N.W.2d 588, 593 (1976); *Olson v. Penkert*, 252 Minn. 334, 90 N.W.2d 193 (1958), and good faith and fair dealing between parties is an im-

---

4. Watson does not dispute that he agreed with Heitman on September 30, 1975 to sell a 50% interest for $3,900,000 rather than $3,500,000 as the September 18th contract stated, and tentatively agreed to sell a 10% interest with a tax loss feature through Heitman. The tax loss deal was not a condition of the $3,900,000 deal; that is, Watson was not necessarily precluded from the CRI tax loss sale by the higher price of the Heitman deal. Watson consummated the basic Heitman proposal, after making some

adjustments. Through a former Heitman employee, Edidin and his partner, he sold tax losses and only approximately one-half the equity interest he would have sold under the CRI deal, for a higher price.

5. He also argues a "bankable written commitment" was not delivered. This was a condition precedent that Watson caused to fail by rejecting the Heitman proposal.

plicit term of any contract. *Earle R. Hanson & Assoc. v. Farmer's Coop. Creamery Co.,* 403 F.2d 65, 69 (8th Cir. 1968) (Minnesota law, equity); *Van Gemert v. Boeing Co.,* 553 F.2d 812, 815 (2d Cir. 1977). In light of CRI's frustration with Watson's previous indecision, which prompted its insistence on a signed agreement, it is reasonable to assume the parties expected Watson had committed himself to *something.* Moreover, a promise to act in good faith and reasonably in bringing the condition about, in accepting or rejecting the Heitman proposal, is necessarily implied. Otherwise, Watson's promise would have been conditioned upon the future happening of an event entirely within his control, and therefore illusory. 1, 1A A. Corbin, *A Comprehensive Treatise on the Working Rules of Contract Law,* §§ 149, 163, 165 (1963); J. Calamari and J. Perillo, *The Law of Contracts* §§ 70, 71 (1970); *see, e. g., Richard Bruce & Co. v. J. Simpson & Co.,* 40 Misc.2d 501, 243 N.Y.S.2d 503 (1963). The term acceptance, in an enforceable bilateral contract such as this became once CRI partially performed, cannot mean privilege to repudiate solely on whim, but excuse for non-performance to be exercised in good faith and honest judgment. See *Jay Dreher Corp. v. Delco Appliance Corp.,* 93 F.2d 275, 277 (2d Cir. 1937); *Commercial Credit Co. v. Insular Motor Corp.,* 17 F.2d 896, 899–900 (1st Cir. 1927).

■ Watson also challenges the court's finding that, "[b]y refusing to perform in accordance with the terms of the September 18 contract, Watson made it impossible for CRI to produce a buyer as required. CRI, at all times, stood ready, willing, and able to produce a buyer, but was precluded from doing so only by Watson's repudiation of the agreement." Watson's factual arguments do not refute the finding that there was "reasonable likelihood of [CRI's] ability to produce a buyer," *Klawitter v. Billick,* 308 Minn. at 333–34, 242 N.W.2d at 594, or that Watson's breach prevented CRI from performing. The court not only found CRI made substantial efforts and lined up at least two potential purchasers, but also that CRI itself was prepared to purchase. Although Watson points out the September 18 contract did not compel CRI to buy, this

alone would not preclude finding CRI was ready and willing to do so. Watson requests this court to reassess the evidence; he does not show the findings below were clearly erroneous.

## III. *Damages.*

Watson asserts error in the damage awards, arguing: (1) Northland may not recover its commission, but only compensation for damage actually caused by breach; (2) there is no evidence of the reasonable value of CRI's or Northland's services, and the amount of CRI's damage award is fundamentally unfair; and (3) Northland and CRI are limited to recovery of net gains.

■ Under Minnesota law, an agent who has substantially and practically performed before breach, as Northland was found to have done here, can recover either the agreed upon commission or compensation for loss of what he would have received if he had been permitted to perform. *Klawitter v. Billick,* 308 Minn. at 329, 242 N.W.2d at 592. The magistrate found Northland's recovery under either standard would be the same: $40,000.

■ Evidence of the reasonable value of Northland's and CRI's services is irrelevant, since each waived that theory of recovery. Nor is CRI's $125,000 award fundamentally unfair. The evidence supports it as the amount of profit CRI realistically expected, and it is not greater than Edidin's profit as Watson's agent in the sale of a smaller interest.

■ Net losses caused or gains prevented are the appropriate measure of damages for breach of an exclusive listing agreement. *Klawitter v. Billick,* 308 Minn. at 332, 242 N.W.2d at 593. As Northland had performed all its obligations at the time of breach, it had already incurred costs deductible from its $40,000 fee. Similarly, CRI had "made substantial efforts" at the time of breach and thus had probably already incurred substantial expenses. Further expenses may have been anticipated, so CRI's award may not accurately represent its expected *net* gain. However, the record does not indicate that Watson raised this issue during trial or even at the later hear-

ing on prejudgment interest. He only challenged the award because it was a "secret profit" and because no certain figure could be set. He did not give or elicit evidence to support deductions from $125,000, the figure CRI claimed as its minimum expectation of profit. Failure to raise this issue below precludes its consideration on appeal.

Finally, Watson urges CRI was barred from bringing the action because it did not have a Minnesota real estate broker's license.[6] We agree with the district court that the subject of the contemplated sale was not a business opportunity, but rather an equity interest in an Iowa limited partnership that owned a shopping center. Indeed, the investment comes closer to the definition of a security in Chapter 80A of the Minnesota statutes, which has its own registration and broker licensing requirements.

### IV. *Prejudgment Interest.*

In a consolidated appeal, Watson challenges awards of prejudgment interest of $15,760.65 to CRI and of $6,372.62 to Northland. Judgment was entered on August 17, 1978, and notice of appeal was filed on September 8, 1978. CRI and Northland moved under Rule 60 of the Federal Rules of Civil Procedure for an award of prejudgment interest on October 3 and 10, 1978; the judgment was amended to include interest on December 22, 1978. The magistrate stated he had inadvertently failed to specify an award of interest and held such a judicial mistake came within Rule 60(b)'s provision for relief on the grounds of "mistake, inadvertence, surprise, or excusable neglect."

In this circuit, relief may be granted under Rule 60(b)(1) for judicial error when inadvertence is shown. *See Hoffman v. Celebrezze,* 405 F.2d 833 (8th Cir. 1969) (inadvertence not shown in allegedly erroneous award of interest); *Southern Fireproofing Co. v. R. F. Ball Constr. Co.,* 334 F.2d 122, 129 (8th Cir. 1964). However, when the alleged error could have been corrected by appeal, the motion must be made within the time period allowed for appeal, so as to prevent its use as a substitute for timely appeal. *Id.* at 836; *see also Gila River Ranch, Inc. v. United States,* 368 F.2d 354, 357 (9th Cir. 1966); *Morgan Guaranty Trust Co. v. Third Nat'l Bank,* 545 F.2d 758, 760 n. 3 (1st Cir. 1976); 7 Moore's Federal Practice ¶ 60.22[3] at 262–63 (2d ed. 1979). This requirement was not met here.

Judgment is ordered affirmed in part and reversed in part in accord with this opinion.

6. Minn.Stat. § 82.33(1) provides in part:

No person shall bring or maintain any action in the courts of this state for the collection of compensation for the performance of any of the acts for which a license is required under this chapter without alleging and proving that he was a duly licensed real estate broker or salesperson at the time the alleged cause of action arose.

Minn.Stat. § 82.17(4) provides in part:

"Real estate broker" or "broker" means any person who:

• • • • •

(c) For another and for commission, fee or other valuable consideration or with the intention or expectation of receiving the same directly or indirectly lists, sells, exchanges, buys, rents, manages, offers or attempts to negotiate a sale, option, exchange, purchase or rental of any business opportunity or business, or its goodwill, inventory, or fixtures, or any interest therein;