Harvey C. HILGENDORF, Appellee,

v.

Mervin D. HAGUE and A. Joan Hague, Appellants.

No. 2–63922.

Supreme Court of Iowa.

June 18, 1980.

Gary J. Boveia, Waverly, for appellants.

E. W. Henke of Henke, Eggert & Schroeder, Charles City, for appellee.

Considered by REES, P. J., and UHLEN-HOPP, McCORMICK, McGIVERIN and LARSON, JJ.

UHLENHOPP, Justice.

This appeal involves liability and damage questions under a listing contract in an action by plaintiff Harvey C. Hilgendorf, a licensed real estate broker. Defendant vendors, Mervin G. and A. Joan Hague, are spouses. The husband conducted the transaction for both spouses, and his authority to do so is not questioned.

We recite the facts in the light most favorable to the trial court's decision for Hilgendorf. For several years the Hagues had been in difficult financial circumstances; they had large indebtedness. They owned land, and Hague himself was also in the silo business. During the period in question they owned 440 acres in three parcels: a 200 acre tract, a bare quarter-section, and a highly improved 80 acre parcel. Their land and personalty were heavily encumbered.

By the beginning of 1976 Hague realized he needed to liquidate land and apply the proceeds to his indebtedness. Hilgendorf was a long-time acquaintance. Hague listed all of the land with Hilgendorf at various prices for the respective parcels.

Subsequently Hague decided he might not have to sell all the land. He determined to sell as much as required to keep afloat financially. With Hilgendorf's consent Hague therefore terminated the listing on the 440 acres on March 29, 1976, and substituted two separate written listings for the 200 acres and the 160 acres, holding back the improved 80 acres. These listings gave Hilgendorf the exclusive right to sell the two parcels for a period of twelve months. The 160 acre parcel, involved here, was priced at $1400 per acre ($224,000). Hague agreed to pay Hilgendorf a commission of six percent of the price if, during the twelve months, Hilgendorf found a buyer ready, willing, and able to purchase on those terms or other agreed terms. Both of the Hagues signed the listings.

Hilgendorf advertised the land but by summer of 1976 had not yet obtained an offer. Subsequently the parties changed the terms of the listing for the 160 acres as to the times of the payments; the Hagues had bought the parcel on contract and the prior vendors would not take all their money at once.

In July 1976 the Hagues' principal creditor, Production Credit Association, notified Hague it would not renew its loan to the Hagues, which was due. PCA held mortgages on the listed land (and on other security), and commenced foreclosure with a view to obtaining its money by the following spring. Hague realized he probably would have to liquidate all the land, and he grew impatient for a sale of it.

James F. Smith had served as the Hagues' attorney for some years. But without consulting Mr. Smith and without Mr. Smith's knowledge, Hague sent Hilgendorf a letter on August 13, 1976, purporting to terminate the listing on the 160 acre parcel (he kept the 200 acre listing in force). In the letter Hague stated he thought that keeping the 240 acres together as a unit was advantageous for the best sale—the 80 acres and the 160 acres. The letter also indicated, however, Hague intended at that time to retain the 160 acre parcel in addition to the 80 acres which he had not listed. In the letter Hague stated: "If Elmer Roalfes is interested in the South [200 acres] Farm we will give him *a long term lease on the North 160 acres* [parcel in question]; this might appeal to him." (Emphasis added.)

Hilgendorf was working with two other realtors, Edgington and Stover, on two separate prospective purchasers, Heineking (acting for Robin Lane Farms, Inc.) and Henning. He did not acquiesce in Hague's termination of the listing of the 160 acres and insisted he had the right to sell the 160 acres as well as the 200 acres Hague still wanted him to sell.

On August 20, 1976, through Hilgendorf, Henning made a written offer of $192,000 to Hague for the 160 acre piece. Hague "just ignored it."

Other brokers contacted Hague about listing the land. One of them was M. G. Kathan, Jr., who approached Hague about September 1, 1976. He sent written listings which Mr. Smith examined for Hague. One listing covered the 200 acre tract and the other covered the 160 acres. Kathan wrote the following in the latter listing: "Kathan Real Estate will agree to share commission if prior listor 'Hilgendorf Realty' should bring suit against seller." The Hagues did not sign these listings.

On September 24, 1976, Hilgendorf produced two written offers to Hague, one for $208,000 from Heineking for the 160 acres and the other for $225,000 from Henning for the 200 acres. Again Hague paid no attention to the bid on the 160 acres; he contended the 80 and 160 acre parcels had to be sold as a unit. Hilgendorf subsequently effected a sale of the 200 acres and received a commission, and that tract plays no further part in the case.

On September 30, 1976, through Stover, Hilgendorf obtained a written offer from Heineking to Hague for the 160 acres in the amount of $224,000, the price in the listing. Hague ignored the offer. Hilgendorf claimed that by obtaining the offer he met the terms of the listing of that tract.

On October 5, 1976, the parties had a meeting in Mr. Smith's office. Hilgendorf claimed he had fulfilled the terms of the listing of the 160 acres. Hague insisted that the 80 and 160 acre parcels had to be sold as a unit, and that Hilgendorf and Kathan could cooperate on the sale of the unit. Apparently Hilgendorf thought—and probably rightly—that this meant sharing the commission; Kathan had written in his proposed listing of the 160 acres that Kathan would "share" the commission if Hilgendorf sued. Hilgendorf was already working with one realtor on this deal—Stover. At any event, Hilgendorf asserted at the October 5th meeting that he had earned the commission on the 160 acres. He flew into a rage and stormed out of the meeting. Hague subsequently listed the 80 acres with Kathan for $400,000.

Hilgendorf consulted with Attorney E. W. Henke. Apparently at that time Mr. Smith still did not know of Hague's August 13th letter purporting to terminate the listing on the 160 acres. At or after the October 5th meeting, Hague counseled further with Mr. Smith. As a result Mr. Smith wrote Mr. Henke a letter on Hague's behalf on November 9, 1976. The letter states:

As you know Mervin D. Hague and A. Joan Hague entered into a listing agreement with Harvey Hilgendorf on or about the 29th day of March, 1976, whereby Harvey Hilgendorf was given a listing to sell a 160 acre farm in Mitchell County, Iowa, for the price of $1,400.00 per acre. $10,000.00 to be paid when the contract of sale was made and final settlement and possession to be given on the first day of March, 1977.

As you further know, Harvey Hilgendorf has produced a purchase agreement containing an offer of $1,400.00 per acre for the 160 acre farm. This letter is to advise you that Mr. Mervin D. Hague acknowledges his obligation to pay to Harvey Hilgendorf his commission for producing a buyer, ready and willing to purchase the 160 acre farm for $1,400.00 per acre, which will be paid to Mr. Hilgendorf on or about the first day of March, 1977.

Please also be advised that Mr. Hague does not at this time intend to accept the offer from the purchaser produced by Mr. Hilgendorf, but is planning to sell the said farm to another purchaser and has retained the services of another realtor for this purpose.

I would appreciate a letter from you acknowledging receipt of this letter and releasing any claim by Mr. Hilgendorf against any other realtor or against Mr. Hague for any commissions derived from the sale of this real estate by another realtor, which commission would be in addition to that owed by Mr. Hague to Mr. Hilgendorf and payable to him on the first day of March, 1977.

Mr. Henke responded that Hilgendorf would accept a note for the commission.

Nothing further came of these negotiations. The factual statements in Mr. Smith's letter can be considered. 29 Am. Jur. 2d *Evidence* § 630 (1967); 31A C.J.S. *Evidence* § 287 (1964).

Later Kathan obtained an offer of $510,-000 from another party for the 80 and 160 acres together, and the Hagues accepted. His commission rate was five percent. Kathan received no commission with respect to the 160 acres, but received $14,300 commission on the 80 acres. He testified his commission was computed thus:

> I charged commission by subtracting to protect my principal, subtracting the amount of the commission Harvey had coming, which was fourteen hundred times a hundred and sixty, which was two hundred and twenty-four thousand, from the total sale of the two-forty, which left two hundred and eighty-six thousand, and five percent [of] which was fourteen thousand three hundred.

In answer to the question, "Do you have any further arrangement with Mr. Hague in regard to the payment of any additional commission?" Kathan answered, "No." And in answer to the question, "So, as a matter of fact, to this date Mr. Hague was not charged or paid a commission on the sale of the hundred and sixty acres?" Kathan responded, "No."

Hilgendorf sued the Hagues. The trial court held for Hilgendorf and the Hagues appealed. The court's fact findings are binding on us if supported by substantial evidence. Iowa R. App. P. 14(*f*)(1).

The Hagues present three propositions but the first two are aspects of the same issue and we treat them together. The Hagues contend that (1) under their straitened financial circumstances they had a right to terminate Hilgendorf's one-year listing of the 160 acre parcel and, as part of his fiduciary duty, Hilgendorf had an obligation to accept the termination and work for the sale of the 80 and 160 acre parcels together if he chose to remain in the picture; and (2) in any event, Hilgendorf cannot recover damages for obtaining the offer on the 160 acres after the Hagues had terminated the listing.

■ I. *Right to terminate listing.* Since agency is a consensual relationship, a principal has *power* to terminate an agency which is not coupled with an interest, although the contract is for a period which has not expired. Ordinarily the agent's authority thereupon ceases. Absent some legal ground, however, the principal does not have a *right* to terminate an unexpired agency contract, and may subject himself to damages by doing so. *Knudson & Richardson v. Laurent*, 159 Iowa 189, 192, 140 N.W. 392, 393 (1913); Restatement (Second) of Agency § 386 (1958).

The whole question regarding liability here turns on whether the Hagues had a legal ground for terminating Hilgendorf's agency before the expiration of the year. All agree that they had power to terminate, but they contend they also had a right to do so. They say PCA would not renew their loan, they had to sell the 80 acres in addition to their other land, and the best way to sell the 80 acres was with the 160 acres. Did these circumstances give them a "right" to terminate the listing contract they had signed on the 160 acres, and cast on Hilgendorf a "duty" to give up his listing contract as a matter of an agent's loyalty to his principal?

■ The Hagues appear to confuse the two roles an agent occupies. In performing agency functions for the principal an agent does indeed occupy a fiduciary position, and his duty of loyalty requires him to place the principal's interests first. Restatement (Second) of Agency § 387. But in the contract of agency itself between the agent and principal, neither of the parties is acting for the other; each is acting for himself.

This case involves the latter role. At all times the Hagues were heavily in debt. Originally they listed all three of their parcels with Hilgendorf. Thereafter Hague, not Hilgendorf, decided he would try to retain the improved 80 acres. This did not involve the performance of agency functions by Hilgendorf; it involved a transac-

tion between the Hagues and Hilgendorf as individuals. Hague himself instigated the change removing the 80 acres and giving an exclusive listing on the two remaining parcels for a year. No evidence whatsoever appears of fraud, overreaching, or misrepresentation in this change of the listing contracts. Indeed, we do not understand the Hagues to claim that the two remaining listing contracts were not originally valid. Their contention is that subsequently, when PCA would not renew their loan, they became financially pressed, and the sale of the 80 and 160 acre parcels together was financially preferable to them.

We may assume that after PCA refused to renew the loan, the Hagues did have to liquidate all the real estate. But financial strictures do not constitute a legal ground for terminating contractual obligations, otherwise contracts would have little or no value. Thus a corporation which goes under cannot "terminate" its valid fixed-term agencies. We do not have a discharge in bankruptcy here. *See* Restatement (Second) of Contracts § 281, Comment *b* and Illustrations 2, 3 (Tent. Draft No. 9, 1974); 17A C.J.S. *Contracts* § 459, at 598–99 (1963) ("Performance is not excused by . . . financial stringency or difficulty, or lack of means . . . .").

■ Several circumstances are given in the texts as grounds for terminating fixed-term agencies, but coming upon hard times is not among them. *See* 12 Am. Jur. 2d *Brokers* § 62 (1964); 12 C.J.S. *Brokers* § 16c, at 49–50 (1938). We agree with the trial court that the Hagues did not have a right to terminate the one-year listing contract on the 160 acres, and that Hilgendorf did not have a duty to give up his listing contract.

■ II. *Damages.* Hague terminated the listing on August 13, 1976. Since Hague had the power to do so, Hilgendorf no longer had authority to sell the 160 acre parcel. For that reason, he cannot recover a commission *as such*, although he thereafter and within the year produced a ready, willing, and able buyer for the price in the listing. Nonetheless, since Hague breached the listing agreement by terminating it, Hilgendorf can recover damages. *Ferguson v. Bovee*, 239 Iowa 775, 779, 32 N.W.2d 924, 926 (1948).

The question here relates to the *measure* of damages Hilgendorf is entitled to recover. The editors state the measure thus in 12 Am. Jur. 2d *Brokers* § 64 (1964):

The courts generally support the principle that a broker whose employment or authority is wrongfully revoked may consider his contract of employment as rescinded and sue for damages, in which event he is entitled to have his recovery include the value of the services he has already rendered, his disbursements, and *such prospective profits as he can establish would have been his but for such revocation. . . .*

(Emphasis added.) Similarly, section 455 of the Second Restatement of Agency states:

If in violation of the contract of employment, the principal terminates or repudiates the employment, or the agent properly terminates it because of breach of contract by the principal, the agent is entitled at his election to receive either:

(a) the amount of net losses caused and *gains prevented* by the principal's breach or, if there are no such losses or gains, a small sum as nominal damages; or

(b) the reasonable value of the services previously rendered the principal, not limited by the contract price, except that for services for which a price is apportioned by the terms of the contract he is entitled to receive the contract price and no more.

(Emphasis added.)

■ Where as here the principal terminates an exclusive listing within the term, the agent may endeavor to show that he would, but for the termination, have sold the property within the unexpired period at the listed price. If he is successful in his proof, his lost profits are ordinarily measured by the commission he would have earned. He does not recover the commission itself, but his damages are measured by the commission. As stated in section 445 of the Restatement, Comment *a* :

If the principal, in breach of contract, prevents the agent from accomplishing the result upon which the agreed compensation is conditioned, the agent is entitled to damages for such breach or, as an alternative, the fair value of his services in attempting to accomplish it. The amount of recovery for damages in such a case is not the specified compensation as such, but the damages which the agent suffers by reason of the breach of contract. *Such damages may coincide in amount with the agreed compensation*; if, however, the agent would have had to incur further expense in order to earn such compensation, and these expenses have been saved to him, he is entitled only to a sum equal to the agreed compensation minus the expenses he has thereby saved.

(Emphasis added.)

For the proposition that lost profits are not recoverable, Hague cites *Ferguson v. Bovee*, 239 Iowa 775, 32 N.W.2d 924 (1948). But that case is factually distinguishable, as an option was involved and the broker apparently did not establish that he would have found a third-party purchaser. More in line with the general rule is *Milligan v. Owen*, 123 Iowa 285, 288, 98 N.W. 792, 793–94 (1904). *See also Sessa v. Gigliotti*, 165 Conn. 620, 621, 345 A.2d 45, 46 (1973); *Isern v. Gordon*, 127 Kan. 296, 300, 273 P. 435, 437 (1929); *H. M. Seldon Co. v. Carson*, 29 Mich.App. 643, 647, 185 N.W.2d 842, 845 (1971); *Fister v. Henschel*, 7 Mich.App. 590, 596, 152 N.W.2d 555, 558 (1967); *Klawitter v. Billick*, 308 Minn. 325, 333, 242 N.W.2d 588, 592 (1976); *Cloe v. Rogers*, 31 Okl. 255, 271, 121 P. 201, 207 (1912); *Dowd More Company Realtors v. McDonald*, 494 S.W.2d 282, 285 (Tex. Civ. App. 1973); *Record Realty, Inc. v. Hull*, 15 Wash.App. 826, 831, 552 P.2d 191, 194 (1976); III A. Corbin, Contracts § 768, at 546–47 (1960).

Here Hilgendorf proceeded on the damage issue by showing "the gains prevented" by Hague's breach of the listing contract. He established beyond question that he would have sold the 160 acre parcel for the full asking price within the listing period. His lost profit was the offered price times the six percent commission rate, and this is the amount the trial court allowed him.

We agree with the trial court's decision.

AFFIRMED.