STERLING CAPITAL ADVISORS,
INC., Appellant,

v.

Raymond H. HERZOG, et
al., Respondents,

Larry S. Severson, Respondent.

No. C7–97–1364.

Court of Appeals of Minnesota.

March 2, 1998.

Thomas L. Fabel, Lindquist & Vennum, P.L.L.P., Minneapolis, for appellant.

Joseph W. Anthony, Douglas L. Elsass, Fruth & Anthony, Minneapolis, and David W. White, Sloan, Listrom, Eisenbarth, Sloan & Glassman, L.L.C., Overland Park, KS for respondents Raymond H. Herzog, et al.

Paul W. Rogosheske, Thuet, Pugh, Rogosheske & Atkins, Ltd., South St. Paul, for respondent Larry S. Severson.

Considered and decided by RANDALL, P.J., TOUSSAINT, C.J., and HOLTAN, J.

## OPINION

HARVEY A. HOLTAN,* Judge.

Appellant contends the district court erred when it granted summary judgment for respondents on appellant's tort and contract claims arising out of a brokerage contract for the sale of a holding company. We affirm.

## FACTS

Respondents John Cobb and Raymond and Jane Herzog are the major stockholders (87%) of a holding company named Financial Services of St. Croix Falls, Inc., which owns the First National Bank of St. Croix Falls (the bank). In early 1995, John Cobb's son, respondent Michael J. Cobb (Cobb), contacted appellant Sterling Capital Advisors, Inc. (Sterling) about the sale of the holding company. Sterling provides banks and bank owners with valuations, financial advisory services, and merger and acquisition services. Cobb spoke with Richard Storlie, Sterling president.

After a meeting, Cobb directed Storlie to prepare a retainer agreement for the sale. In the event of a sale, Sterling would receive a $110,000 advisory fee plus 3% of any sale proceeds over the $5.4 million target sale price. The letter agreement provided that Sterling would represent the holding company for 270 days from the signature of the agreement, after which point either the shareholders or Sterling had the power to terminate the agreement.

The Cobbs and the Herzogs represented and warranted that they were "willing to retain [Sterling] as their exclusive financial advisor for the express purpose of formulating and possibly executing a business divestiture strategy on such terms and conditions" as were provided in the letter agreement. They also represented and warranted that they had "the right and authority to sell" the holding company. The key clause of the agreement provides:

> [Cobbs and Herzogs] may accept or reject any and all offers at [their] sole discretion, provided, however, that all other terms and conditions set forth in this Agreement shall remain in full force and effect, notwithstanding [Cobbs and Herzogs]'s acceptance of any and all offers.

In the following months, Sterling attracted ten offers for the purchase of the holding company, several of which were higher than the $5.4 million target price. Storlie presented the package of offers to the Cobbs on August 15, 1995. They gave this information to their certified public accountant, George Diller, and asked him for a comparative analysis of tax consequences and net sale proceeds. Diller gave the shareholders a full comparative analysis of the bids.

On September 7, 1995, the shareholders met and rejected all bids. On September 12, 1995, attorney for the holding company, respondent Larry Severson, informed Storlie of the shareholders' decision and directed Storlie to inform bidders that the holding company was no longer for sale. Severson followed up this conversation with a letter containing the same information.

When Storlie questioned how he would be compensated for his services under the letter agreement, Severson sent another letter informing Storlie that the holding company had already paid him a non-refundable deposit of $1,000 and would pay him any expenses, up to $2,800, as agreed in the letter agreement, but would pay no other fees. As Severson interpreted the letter agreement, Sterling was entitled to its advisory fee only "if an acquisition or merger is actually completed." Given that the merger and acquisition never

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. Art. VI, § 10.

occurred, Severson and the shareholders believed that Sterling and, consequently, Storlie, had not earned that additional fee.

Sterling then brought this action to enforce the letter agreement, claiming that it has been deprived of its portion of the sales proceeds, even though various buyers existed, simply because the holding company refused to sell. In an amended complaint, Sterling raised the claims of breach of express warranties, breach of implied covenant of good faith and fair dealing, breach of contract, breach of quasi-contract (quantum meruit and unjust enrichment), and tortious interference with contract. Respondents moved for summary judgment.

After a hearing, the district court granted respondents' motion on all claims, reasoning that the express clause that gave respondents the right to reject any and all offers at any time controlled the parties' business relationship and defeated all of Sterling's claims.

### ISSUE

Did the district court err in ruling that the right to reject clause warranted summary judgment for respondents on all of Sterling's claims?

### ANALYSIS

Summary judgment is appropriate only when:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that either party is entitled to a judgment as a matter of law.

Minn. R. Civ. P. 56.03. On appeal from summary judgment, this court must determine whether any genuine issues of material fact exist and whether the district court erred in its application of the law. *Wartnick v. Moss & Barnett*, 490 N.W.2d 108, 112 (Minn.1992). We must view the evidence in the light most favorable to the party against whom judgment was granted. *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn.1993).

■ Sterling first argues that the shareholders breached the letter agreement by rejecting the offers and withdrawing the holding company from the market. The terms of the parties' letter agreement govern this case. Interpretation of a contract is a question of law for the court. *Katzner v. Kelleher Constr.*, 535 N.W.2d 825, 828 (Minn. App.1995), *aff'd*, 545 N.W.2d 378 (Minn.1996).

■ As the drafter of the brokerage agreement, Sterling had the right and opportunity to include any terms and conditions it considered necessary to protect itself. Consequently, any ambiguity in the document must be interpreted against Sterling. *See Current Tech. Concepts, Inc. v. Irie Enters., Inc.*, 530 N.W.2d 539, 543 (Minn.1995) (requiring court to resolve ambiguity against drafter of contract); *Marso v. Mankato Clinic, Ltd.*, 278 Minn. 104, 115, 153 N.W.2d 281, 289 (1967) (clinic that drafted all employment contracts at issue bore burden of making contract language clear and court would resolve any ambiguity against it).

Sterling bases its breach of contract claim on *Klawitter v. Billick*, 308 Minn. 325, 242 N.W.2d 588 (1976). That case involved a lawsuit between a realtor and the seller of land, based on an exclusive sale listing agreement. *Id.* at 327, 242 N.W.2d at 590–91. The court held that the seller breached the contract because he did not have the unilateral right to modify the bilateral contract by deciding not to sell at the agreed price before the exclusive listing agreement expired. *Id.* at 330, 242 N.W.2d at 592.

Seeking to relate *Klawitter* to the shareholders' decision not to sell here, Sterling focuses on the *Klawitter* court's comment that the seller's "change of mind" about the sale did not constitute reasonable cause to revoke the listing agreement. *Id.* at 332, 242 N.W.2d at 593. The dispositive difference between this case and *Klawitter*, however, is that the exclusive listing agreement in *Klawitter* did not include a "right to reject" clause. Sterling drafted that clause which, by its plain language, gave the shareholders the unlimited discretion to reject any and all offers. Sterling has not raised a fact issue on the breach of contract claim. Summary judgment was proper.

■ Sterling seeks to restrict the shareholders' unlimited discretion in the contract, however, by imposing the implied covenant of good faith and fair dealing onto the right to reject clause. *See White Stone Partners, LP v. Piper Jaffray Cos.*, 978 F.Supp. 878, 882 (D.Minn.1997) (requiring that party act in good faith when exercising unlimited discretionary power under contract); *see also CRI, Inc. v. Watson*, 608 F.2d 1137, 1142 (8th Cir.1979) (bilateral contracts imply good faith in bringing about future condition; ability to repudiate "on whim" would render contract illusory). The Minnesota Supreme Court has not yet ruled on this specific issue. Minnesota law does, however, impose an implied covenant of good faith and fair dealing into every non-sales contract to prevent one party from unjustifiably hindering the other party's performance of the contract. *In re Hennepin County 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn.1995). Even if we assume that the *White Stone* analysis correctly defines Minnesota law, Sterling still has not raised a fact issue.

■ The shareholders were exercising a contract right when they rejected the offers and decided to wait to sell the holding company. A party to a contract "does not act in bad faith by asserting or enforcing its legal and contractual rights." *Burgmeier v. Farm Credit Bank*, 499 N.W.2d 43, 50 (Minn.App. 1993), *review denied* (Minn. July 15, 1993). Sterling contends, however, that the shareholders acted in bad faith because Cobb and Severson deceived and misled them by presenting skewed financial analyses and over-discounting the offers.

■ This argument, with regard to an action against the shareholders directly, is misdirected. If the shareholders were "misled," as Sterling alleges, then they mistakenly rejected the offers. Such a mistake does not constitute bad faith. "Bad faith" is defined as a party's refusal to fulfill some duty or contractual obligation based on an ulterior motive, not an honest mistake regarding one's rights or duties. *Lassen v. First Bank Eden Prairie*, 514 N.W.2d 831, 837 (Minn. App.1994), *review denied* (Minn. June 29, 1994). Actions are done in "good faith when

done honestly, whether it be negligently or not." Minn.Stat. § 520.01, subd. 6 (1996).

Even if the argument made logical sense, Sterling did not present sufficient evidence to raise a fact issue that the shareholders acted in bad faith. The minutes of the shareholders' meeting reveal that they legitimately considered the offers to purchase the bank, but, finding the bids unacceptably low, decided to exercise their contractual right to reject. The shareholders attributed the problems with sale to the poor financial condition of the bank and decided to wait to sell until it recovered financially.

■ Sterling suggests that, because the parties had a threshold price of $5.4 million for the sale, the shareholders acted in bad faith by rejecting any bid over that amount. The $5.4 million figure, however, was simply listed in the brokerage agreement as part of the compensation package for Sterling's services; as an "advisory fee," Sterling would receive "$110,000 plus 3% of the amount of purchase in excess of $5,400,000.00." The $5.4 million figure was not listed as a determining factor of the sale. The contract merely stated their ability to sell; nowhere in the brokerage agreement were the shareholders bound to accept any bid over $5.4 million. Furthermore, the shareholders informed Sterling of their desire to take the holding company off the market in an effort to save Sterling's time. Had the shareholders not been so forthright, Sterling may have continued presenting bids for the full 270-day period of the letter agreement, only to have the shareholders reject each one in turn. The shareholders' exercise of the absolute right to reject, by taking the holding company off the market, was comparable to the withdrawal of the subject matter of the contract. *See Erickson v. Brotherhood of Locomotive Firemen & Enginemen*, 129 Minn. 264, 266, 152 N.W. 537, 538 (1915) (without subject matter of contract, no valid contract and no liability exists).

■ We also reject Sterling's argument that the right to reject clause rendered the contract illusory. The brokerage agreement was a fully negotiated contract for which both parties gave consideration. Sterling agreed to provide the brokerage services.

The shareholders maintained their agreement to use Sterling as their exclusive agent; the shareholders did not court other offerors or consult other brokers; they bound themselves to limit their scope to the offers Sterling produced. Further, the brokerage agreement protected both parties; Sterling made no guarantees of procuring a bidder or a sale and the shareholders had the right to reject any and all offers.

Sterling has failed to raise a fact issue regarding the shareholders' bad faith.

■ With regard to Cobb and Severson, Sterling has also failed to raise a fact issue that they acted in bad faith. Sterling contends Severson and Diller exaggerated the amount of potential liability the bank carried at the time of the proposed sale and, as a result, overly reduced the bids and the bottom line profit for the shareholders. To support this claim, Sterling presented evidence that a pending lawsuit against the bank settled for $13,500, whereas Diller had projected that the bank had up to $750,000 in liability. Sterling also alleged that the $500,-000 the bank allotted for substandard and doubtful loans was unnecessarily inflated. Sterling's argument with regard to the substandard loans is based on Storlie's "opinion" that the discount was vastly inflated. This opinion, however, was not supported by any factual analysis.

From this evidence, Storlie concludes, in his "opinion," that the shareholders were deliberately misled into rejecting the bids for the sale of the bank. We disagree. This evidence does not raise the inference that Cobb and Severson invoked the right to reject clause in bad faith. *Cf. White Stone,* 978 F.Supp. at 885 (holding plaintiff alleged sufficient facts to withstand dismissal and support inference that defendants, who dishonestly invoked escape clause, acted in bad faith). Storlie's opinion regarding the events that occurred is irrelevant and insufficient to withstand summary judgment. *See Urbaniak Implement Co. v. Monsrud,* 336 N.W.2d 286, 287 (Minn.1983) (affidavit containing argumentative and conclusory statements is insufficient to withstand summary judgment). Further, the fact that the lawsuit settled for a materially less amount than Diller had projected was completely beyond his control and did not raise a reasonable inference of bad faith. Sterling failed to raise a fact issue over Cobb's and Severson's bad faith.

■ Given that Sterling has not raised a fact issue over Cobb's and Severson's bad faith, we cannot impute any alleged bad faith of these men to the shareholders. The shareholders could only have bad faith imputed to them via agency principles, due to the efforts of Cobb and Severson to assist the shareholders in selling the holding company. *See Virtue v. Creamery Package Mfg. Co.,* 123 Minn. 17, 31–32, 142 N.W. 930, 935–36 (1913) (principal is responsible for torts of agent committed within course of employment or line of duty, in effort to further principal's business, and not for "purpose personal to himself"). If we accept Sterling's argument as true, then Cobb allegedly "did not want the bank to be sold." Acting on this personal agenda, Cobb, Severson, and accountant Diller allegedly "orchestrated an analysis of the offers which portrayed them as quite undesirable." These allegations reveal a purpose personal to Cobb, contrary to his orders, and not within his scope of employment as an agent of the shareholders. Under these circumstances, we cannot impute any alleged bad faith from Cobb and Severson to the shareholders.

■ Sterling also contends it raised fact issues to support its claim for breach of quasi-contract, alleging that it provided the shareholders with valuable services for which it deserves compensation. We disagree. The existence of an express contract between the parties precludes recovery under the theories of quasi-contract, unjust enrichment, or quantum meruit. *Sharp v. Laubersheimer,* 347 N.W.2d 268, 271 (Minn.1984) (citing *Breza v. Thaldorf,* 276 Minn. 180, 183, 149 N.W.2d 276, 279 (1967)). The letter agreement governed the relationship between the parties and set forth the $1,000 downpayment to Sterling, the provision for up to $2,800 in expenses for Sterling, and the flat advisory fee plus percentage over the target price if the sale occurred. This contract precludes a claim for breach of quasi-contract. *Id.* Further, because the contract here

contained the parties' full agreement regarding Sterling's compensation, Sterling's unjust enrichment claim fails. *See Midwest Sports Mktg., Inc. v. Hillerich & Bradsby of Canada, Ltd.,* 552 N.W.2d 254, 268 (Minn.App. 1996) (affirming summary judgment on claim for unjust enrichment where valid contract governed parties and detailed compensation for performance of duties), *review denied* (Minn. Sept. 20, 1996). Based on this authority, summary judgment was proper.

 Next, in challenging summary judgment on the tortious interference with contract claim, Sterling alleges that it presented evidence that Severson and Cobb intentionally misled the shareholders into rejecting the offers and taking the holding company off the market. In order to withstand summary judgment, Sterling needed to raise fact issues on the five elements of a tortious interference with contract claim, one of which is the breach of a contract. *See Kjesbo v. Ricks,* 517 N.W.2d 585, 588 (Minn. 1994) (listing elements of claim for tortious interference with contract). Because no breach occurred here, Sterling's claim for tortious interference with contract must fail. *See Midwest Sports Mktg., Inc.,* 552 N.W.2d at 267 (determining that tortious interference with contract claim failed when plaintiff failed to establish one element of claim). Summary judgment was appropriate.

Finally, Sterling challenges summary judgment on the breach of express warranty claim by arguing that the shareholders breached their express warranty of authority to sell the bank. We disagree. A warranty is an assurance that one party to a contract gives regarding the existence of a fact, upon which the other party to the contract can rely. *Schmitt v. Ornes Esswein & Co.,* 149 Minn. 370, 371, 183 N.W. 840, 841 (1921). The duty to warrant performance must be expressly written in the contract; a warranty cannot arise solely by implication. *Buchman Plumbing Co. v. Regents of the Univ. of Minn.,* 298 Minn. 328, 340, 215 N.W.2d 479, 486 (1974).

Sterling bases its argument on the shareholders' representation and warranty in the letter agreement that they had "the right and authority to sell" the holding company.

Such a warranty is a statement of the shareholders' ownership and legal ability to sell. The language of this warranty in no way suggests a promise to sell or a willingness to sell. Given that the warranty of willingness to sell was not expressly stated in the letter agreement, it is not enforceable here. *Id.* Further, because Sterling has not called into question the shareholders' warranty of their authority to sell the bank, summary judgment on the breach of express warranties was proper.

### DECISION

The shareholders exercised their contract right when they rejected all offers for the bank. No breach of contract occurred here. Sterling has failed to raise any fact issues regarding its claims for breach of the implied covenant of good faith and fair dealing, quasi-contract, express warranties, or tortious interference with contract. Summary judgment on all the claims was proper.

**Affirmed.**