**LAKE SUPERIOR PAPER INDUSTRIES, Relator,**

v.

**STATE of Minnesota and County of St. Louis, Respondent,**

v.

**City of Duluth, Intervenor, Respondent.**

No. C0–00–598.

Supreme Court of Minnesota.

April 5, 2001.

Robert C. Maki, Maki & Overon, Robert Asleson, City of Duluth, for respondent City of Duluth.

Michael R. Dean, St. Louis County Attorney's Office, Duluth, for respondent County of St. Louis.

## OPINION

GILBERT, Justice.

This case involves a developer's property tax challenge of the assessor's value of a redeveloped property that was financed in part by the use of tax increment bonds pursuant to Minn.Stat. § 469.177 (1990) for the City of Duluth's (City) contribution. The developer is also challenging the validity of the assessment agreement. The tax court ruled in favor of the City on the

City's cross motion for summary judgment. We affirm.

The facts relevant to this appeal are undisputed. On December 2, 1985, Lake Superior Paper Industries (LSPI) and the City entered into a development agreement whereby LSPI agreed to build a paper mill on blighted industrial waterfront property. The mill was designed to manufacture supercalendered paper, which is a semi-glossy paper used in advertising supplements as well as specialty catalogues, magazines, and commercial printing. The initial plans indicated that the mill's production capacity would reach 235,700 tons of paper per year, and operations were scheduled to begin by January 1988. Preliminary documents prepared by the City estimated that the total cost in redeveloping the paper mill site exceeded $450,000,000.

The development agreement obligated the City to incur the costs to acquire the land targeted for redevelopment, prepare it for redevelopment, and then sell it to LSPI. Among other things, the agreement required the City to demolish existing structures, rezone the land, make utility improvements, and vacate existing street, avenue, alley, and utility easements. In addition, the agreement required the City to supply the mill with up to 240,000 pounds of steam per hour by acquiring, retrofitting, and operating boilers from a nearby steam plant—the M.L. Hibbard Steam and Electric Station.

The development agreement also provided that the City's share of the project's costs would be funded by a $29,300,000 issuance of tax increment revenue bonds. The City entered into an indenture agreement with the First National Bank of Chicago in 1985 ("Trust Indenture"), and the issuance was supported by a letter of credit from National Australia Bank Limited until 1993. Of the total issuance, approximately $5,100,000 was dedicated to acquire and prepare the waterfront property for development, pay the capitalized interest, and pay the costs of issuing the bonds.

The remaining $24,200,000 was reserved for the City's expenses associated with acquiring and improving the Hibbard Steam Plant.

The development agreement obligated LSPI to incur the paper mill's construction and operation costs and it also required LSPI to purchase the redevelopment property from the City once the City's obligations under the agreement were complete. Included in an amendment to the agreement was a statement regarding the parties' intent to execute an assessment agreement in the future setting the minimum market value of the paper mill at a reasonable value. The proposed assessment agreement was attached to the development agreement as "Exhibit O," but the dollar amounts were left blank.

The Trust Indenture directed that bond payments would first be deposited into the tax increment account to meet the mandatory bond payment requirements. Any amount remaining in that account at the end of the year—which would represent any amount collected in excess of the payment liability—would be transferred into the reserve fund where the funds would accumulate. The Trust Indenture directed that if the amount in the reserve fund exceeded the minimum reserve requirement, the excess would be transferred to the redemption account. Any funds transferred into the redemption account were then to be applied to the principal, which over time could result in retiring the bonds before their maturity date.

On December 24, 1987, LSPI and the City signed a Certificate of Completion and Continuation Agreement, which certified that LSPI had completed construction and had initiated operation of the paper mill. The agreement also detailed additional responsibilities of each party, including the development-related work not yet completed. The agreement indicated that the new document would supersede the original development agreement "except as otherwise setforth [there]in." The agreement

also stated that the parties intended to "execute an Assessment Agreement substantially in the form attached hereto as Exhibit O."

Although the record is not clear as to the reason for the delay, active negotiation on an assessment agreement did not begin until early 1990. Letters between counsel for each party indicated that there was some confusion as to whether the paper mill's minimum market value was $56,578,900 or $42,742,100. After further negotiations, LSPI and the City signed an assessment agreement in January 1991, which set the minimum market value of LSPI's paper mill and underlying and surrounding real estate at $42,742,100. The effective date of the agreement was January 1, 1988. The City Assessor certified that $42,742,100 was a reasonable market value for the paper mill. Shortly after the assessor certified the assessment agreement's minimum market value, he retired, and he did not retain his notes regarding the paper mill's valuation. The agreement was recorded in December 1992 after LSPI completed its final obligations, one of which included determining the legal description of the real estate.

In November 1996, LSPI requested the City to agree to adjust the paper mill's minimum market value downward. The City refused to agree to a downward adjustment,[1] and LSPI sought judicial relief. In total, LSPI petitioned for review of its 1996, 1997, and 1998 property taxes, and those petitions were consolidated into one case. Because LSPI challenged the interpretation of a statute and the validity of the assessment agreement, the parties agreed to bifurcate the case.

LSPI brought a motion for summary judgment requesting the tax court to invalidate the minimum assessment agreement, and the City brought a cross-motion for summary judgment. The tax court granted the City's motion for summary judgment. It concluded that the assessment

agreement was valid and that the City did not unreasonably withhold its consent to employ the adjustment clause. The tax court also held that although construction of the improvements may have been largely completed at the time the assessment agreement was entered into, there were still several uncompleted tasks that were part of the overall project development. These uncompleted tasks included assembling and acquiring additional land, *i.e.* additional purchases; vacating utility easements in City streets, avenues, and alleys; platting; title work; and related surveying. Therefore, the court held that the parties complied with the governing statute. In addition, the tax court held that the City Assessor's certification of the paper mill's minimum value was valid because the assessor complied with the statutory requirements. The tax court refused to address an issue related to the enforceability of a stipulation by the parties, and that issue is therefore not an issue in this appeal.

On appeal, LSPI argues that the tax court erred in interpreting and applying the adjustment clause in the parties' assessment agreement and in determining that the mill's construction was not completed until after the assessment agreement was executed; that the assessor's certification of value for the assessment agreement was valid; and that there were no genuine issues of material fact that would preclude summary judgment in the City's favor. LSPI argues that any one of the alleged errors would invalidate the assessment agreement, which would cause the paper mill to be assessed at its actual market value under the default provisions of Minn.Stat. § 273.11, subd. 1 (1996).

## I.

On an appeal from summary judgment from the tax court, this court determines "whether there are any genu-

---

1. On January 2, 1995 and on January 2, 1996, the assessor estimated that the paper mill's market value was higher than the paper mill's minimum assessed value.

ine issues of material fact and whether the lower court erred in its application of the law." *Brookfield Trade Ctr., Inc. v. County of Ramsey,* 584 N.W.2d 390, 392–93 (Minn.1998) (hereinafter *Brookfield I* ). Here, the issues relate to whether the tax court erred in its application of the underlying statute when it interpreted the parties' minimum assessment agreement pursuant to Minn.Stat. § 469.177, subd. 8 (1990). This court reviews statutory interpretation de novo. *Brookfield I,* 584 N.W.2d at 393. Contract interpretation is also a legal issue that we review de novo. *See Turner v. Alpha Phi Sorority House,* 276 N.W.2d 63, 66 (Minn.1979).

LSPI first argues that the tax court erred in holding that "the City had no obligation ever to agree to a downward adjustment, and that the only adjustment possible under [the assessment agreement] would be an upward adjustment." Our review of the tax court's decision indicates that the tax court never made such a determination. Because this argument lacks merit, we decline to address it.

## II.

■ LSPI next argues that the City unreasonably withheld its consent to LSPI's request for a downward adjustment in the market value of the redeveloped property. LSPI argues that the tax court erroneously considered extrinsic evidence of a letter from LSPI's former counsel to Minnesota Power, and the language of the trust indenture between the parties entered into years before the assessment agreement. LSPI further argues that the City had no reasonable basis for refusing LSPI's request. The City argues that its refusal was not unreasonable because none of the agreements contemplated or executed by the parties required the City to lower the minimum assessed value whenever LSPI requested an adjustment. Further, the City argues that the agreement permits the addition of excess funds to the reserve fund and redemption account to reduce the bonds before their scheduled maturity. The tax court found that the City did not unreasonably withhold its consent to adjust the minimum market value.

■ Our review of this issue is limited to determining "whether there are any genuine issues of material fact and whether the lower court erred in its application of the law." *Brookfield I,* 584 N.W.2d at 392–93. LSPI points to a letter dated December 20, 1985 that was written by its attorney to Minnesota Power, which was one of LSPI's partners, stating his understanding that the City would have the discretion to use excess tax increment payments to retire the bonds early. This letter from LSPI's counsel was provided without objection by LSPI to the City in response to a discovery request, and the letter constitutes a communication to a third party that was voluntarily made on behalf of LSPI. LSPI argues that the December 20, 1985 letter was extrinsic evidence and the City was precluded from introducing it by a tax court order prohibiting the introduction of (1) certain identified and already produced documents withheld based on the claim of privilege, (2) documents not previously produced which refer to the privileged documents referred to in the order, (3) oral testimony or affidavits referring to the privileged documents, and (4) other extrinsic evidence relating to the material claimed as privileged. However, this letter was previously produced by LSPI, and it was excepted from the preclusion order. As a result, the tax court did not err in receiving the December 20, 1985 letter into evidence and relying upon it.

LSPI also argues that based on the plain language of the assessment agreement, the City's refusal to adjust the paper mill's minimum market value downward constituted a breach of the implied covenant of good faith and fair dealing. LSPI further argues that the trust indenture language does not "preclude the parties' subsequent agreement to the adjustment clause in the Assessment Agreement" and, in any event, the Trust Indenture was

irrelevant. We have held that when interpreting minimum assessment agreements, the language of the agreement is to be given its plain and ordinary meaning. *Brookfield I*, 584 N.W.2d at 394. The adjustment clause at issue in this case provides:

> Due to the complex nature of the improvements and the real estate involved and the complexity of the Redevelopment Project, the market value and tax payments may be subject to adjustments as agreed by the City and LSPI at any time during the course of this Agreement.

Considering this language alone, there is no indication that the adjustment clause requires an adjustment whenever one party requests the adjustment. The adjustment clause indicates that the minimum market value can be changed only when both parties agree to the change.

LSPI relies on *In re Hennepin County 1986 Recycling Bond Litigation* to support its position that the City's refusal breached the implied covenant of good faith and fair dealing. 540 N.W.2d 494 (Minn.1995). However, in *Hennepin County 1986 Recycling Bond Litigation*, we simply determined that the bond holders pleaded a claim for breach of the implied covenant of good faith and fair dealing that was sufficient to withstand the defendant's Minn. R.Civ.P. 12.02(e) motion to dismiss. *Hennepin County 1986 Recycling Bond Litigation*, 540 N.W.2d at 503. We did not decide the substantive issue for which LSPI cites this case, *i.e.*, whether the defendants actually breached the implied covenant of good faith and fair dealing. *Id.* There is nothing in the record to support the contention that the City's refusal to adjust the paper mill's minimum market value was either unreasonable or a breach of the implied covenant of good faith and fair dealing. In fact, LSPI's argument that the use of the funds complained of "to make additional unscheduled payments to the bondholders, thereby accelerating the date when the bonds would be fully paid"

is precisely what the Trust Indenture's reserve fund and redemption account were designed to accomplish. We hold that the tax court did not err in finding that the City did not unreasonably withhold its consent to employ the adjustment clause to adjust the paper mill's minimum market value downward.

### III.

■ LSPI next argues that because Minn.Stat. § 469.177, subd. 8 (1990), like its predecessor statute Minn.Stat. § 273.76, subd. 8 (1984), requires that an assessment agreement be executed prior to completion of the improvements, the assessment agreement at issue in this case is invalid because construction of the paper mill was completed well before the minimum assessment agreement became effective in 1991. The City argues that this reading of the statute is too narrow because it allows one party's delay to prevent the execution of a valid assessment agreement. The tax court held that the agreement was valid and resolved LSPI's argument by first citing *PRN Music Corp. v. County of Carver*, in which the tax court held that an assessment agreement is invalid if it is signed after the development is completed. No. C8–92–523 1994 WL 258409 at *1 (Minn. T.C. June 7, 1994). The tax court held that in the instant case, the agreement was valid because it was signed in January 1991, which was before the property development was completed because title work and the complete conveyance of the final land plats was not completed until November 1992. *Id.* Resolution of this issue requires us to review de novo "whether there are any genuine issues of material fact and whether the lower court erred in its application of the law." *Brookfield I*, 584 N.W.2d at 392–93.

We have never had occasion to examine the language of the assessment agreement statute in order to determine the narrow issue of when an assessment agreement becomes effective. In *PRN Music Corp.*, the tax court stated that the assessment

agreement was effective when both parties signed it. 1994 WL 258409 at *1. The tax court made the same finding in this case, determining that the agreement was not effective until signed in January 1991. We agree with the tax court's reasoning as to this issue. We therefore hold that the assessment agreement became effective when it was signed in January 1991. As a result, the statute that governs the agreement is Minn.Stat. § 469.177, subd. 8 (1990).

When the agreement became effective in January 1991, this assessment statute provided:

> An authority may * * * enter into a written assessment agreement in recordable form with the developer or redeveloper of property within the tax increment financing district which establishes a minimum market value of the land and completed improvements to be constructed thereon * * *.

Minn.Stat. § 469.177, subd. 8.[2] Although this statute permits assessment agreements "establish[ing] minimum market value[s] of the land and completed improvements to be constructed thereon," it does not define "completed improvements." Minn.Stat. § 469.177, subd. 8. We have never interpreted "completed improvements" in the context of this statute. In the instant case, the tax court determined that "completed improvements" meant completion of the entire development. It further found that there were several uncompleted tasks that were part of the overall project development and were specifically noted in the continuation agreement. The tax court recognized that the construction of improvements may have been largely complete by the time the assessment agreement was executed, but that the term "development" is broader than "construction of improvements" and

encompasses things such as land acquisition and transfer.

■ This case does not require us to determine the meaning of existing or "completed improvements," and LSPI's reliance on *PRN Music Corp.* is misplaced. In *PRN Music Corp.*, the relator purchased the subject property from a private party in the fall of 1985 and completed construction of a recording studio in 1987. 1994 WL 258409 at *1. Then, in 1989, PRN and Carver County signed an assessment agreement and made the agreement retroactive. *Id.* When the tax court considered the validity of the assessment agreement, it examined when the agreement was signed in relation to when the development was completed. *Id.* On those facts, the tax court determined that the agreement was invalid because it was executed after the development was completed. *Id.* Here, it is undisputed that at the time the parties executed the assessment agreement in January 1991, all of the land contemplated in the development agreement had not even been acquired, vacated, or platted, nor had LSPI completed the title and plat work it was responsible for completing.

LSPI argues that the only statutory criterion relevant in determining whether the assessment agreement is valid is whether the construction of the physical improvements were completed before the assessment agreement became effective. However, both Minn.Stat. § 469.177, subd. 8 and the development agreement executed by the parties in 1985 encompass more than the mere completion of the construction of physical improvements in establishing minimum market values. Minnesota Statutes § 469.177, subd. 8 requires that the assessment agreement establish "a minimum market value of the land *and* completed improvements to be constructed thereon * * *." (emphasis added). This language indicates that the minimum mar-

**2.** Minnesota Statutes § 467.177, subd. 8 (1990) was amended and the new language was effective June 1, 1991. Minn.Stat. § 469.177, subd. 8 (1991). The new language

indicates that an assessment agreement may be entered into for land, existing improvements, or improvements to be constructed.

ket value in an assessment agreement includes two components—land and completed improvements constructed thereon. The agreements entered into by the parties in the instant case recognize both components.

The development agreement states that LSPI "has proposed that the City establish a renewal program (the 'Redevelopment Plan') which has as its objective the assembly of a paper mill site of approximately 92 acres (the 'Property') * * *." This language includes not only the improvements contemplated by the parties but also the acquisition and transfer of land to LSPI. Later in the development agreement, the parties included the following definition:

"Project" means the construction and operation of (i) the Paper Mill, (ii) the City Sewer Improvements, (iii) the City Site Improvements, (iv) the City Steam Improvements, (v) the City Utility Improvements, and (vi) any additional improvements made by [LSPI] on the Redevelopment Property pursuant to the terms of this Agreement.

This language also indicates that the parties intended that the redevelopment project included more than simply the construction of the paper mill.

Moreover, the Certificate of Completion and Continuation Agreement reiterates the notion that the improvements contemplated by the parties included more than simply the construction of a paper mill. In the continuation agreement, the parties acknowledge that although LSPI completed construction of the paper mill and initiated operation, the assembly of the land for the site had not yet been completed. The continuation agreement also outlines the remaining duties of each party. The City was obligated to complete site improvements and sewer improvements and to also vacate street, avenue, alley, and utility easements and use its "best efforts" to acquire additional properties for LSPI and then sell those additional properties to LSPI. The agreement also outlined LSPI's

obligation to purchase additional land and plat the entire paper mill site within 1 year after the conveyance of the last portion of the property. The Certificate of Completion and Continuation Agreement also reiterated the parties' intention to execute "Exhibit O," the assessment agreement at issue herein. This agreement establishes the minimum market value of both the land and "improvements constructed thereon." Minnesota Statutes § 469.177, subd. 8 has the same two requirements.

Our review of the record indicates that although the construction of the paper mill was completed in 1987, the tax court was correct in determining that the assembly and acquisition of the land on which the improvements were to be constructed was not completed in January 1991, the date of the assessment agreement. Furthermore, it was LSPI that had the responsibility to complete the final plat and title work, which was not accomplished until November 1992. Therefore, we hold that the tax court did not err in determining that the assessment agreement was in compliance with Minn.Stat. § 469.177, subd. 8.

## IV.

■ LSPI next argues that the assessment agreement should be invalidated because the city assessor did not follow professional appraisal standards when certifying the minimum assessed value of the paper mill, which resulted in an unreasonable minimum market value. The City argues that the city assessor complied with the statutory duties imposed by Minn.Stat. § 469.177, subd. 8 in preparing the certification of minimum market value. When the tax court considered this issue, it held that the assessment agreement was valid and enforceable. In reaching its decision, the tax court noted that John Young, then Duluth City Assessor, testified that he retained independent appraisers to value the land, required an appraisal on each parcel, received the paper mill's blue-

prints, used cost and construction manuals, inspected the facility numerous times, consulted with assessors in other communities where similar paper mills were located, and signed a certification acknowledging that he complied with the statute. The tax court pointed out that the city assessor's testimony was uncontroverted in regard to his compliance with the statutory requirements.

This issue involves a de novo determination of whether the Duluth City Assessor complied with the statute governing certification of assessment agreements. *Brookfield I,* 584 N.W.2d at 393. We recently addressed the issue of whether an assessor's certification complied with the statute governing assessment agreement certification requirements in *Brookfield Trade Ctr., Inc. v. County of Ramsey,* 609 N.W.2d 868, 874 (Minn.2000) (hereinafter *Brookfield II* ). In *Brookfield II,* the developer challenged the validity of the minimum assessment agreement, arguing that the assessor did not perform "an independent valuation analysis of the subject property to determine if the proposed minimum market value is a reasonable estimate." *Id.* We held that a full market value appraisal was not required and that the assessment agreement statute "simply requires the assessor to determine whether a minimum market value agreed to by the parties and presented to the assessor is a reasonable estimate." *Id.* at 875. We further held that our focus turns on whether there are genuine issues of material fact as to whether the assessor complied with the statute. *Id.* We stated:

> Specifically, we must determine whether the assessor received the proposed minimum market value, reviewed the plans and specifications for the proposed development, considered the previous market value for the property, and determined that the minimum market value in the agreement was a reasonable estimate.

*Id.* We next considered the available evidence in light of the presumption that

assessors, as government officials, perform their duties properly and comply with statutory procedures when certifying minimum market values. *Id.* at 876.

In the instant case, we can apply the same analysis articulated in *Brookfield II.* Here, Young certified that he (1) received the proposed minimum market value, (2) reviewed the plans and specifications for the improvements constructed, (3) reviewed the market value assigned to the land as described in an attached exhibit and upon which the improvements have been and are to be constructed, and ultimately determined that the minimum market value contained in the foregoing assessment agreement appeared reasonable. The certification was signed by Young and notarized. Consistent with our holding in *Brookfield II,* absent probative evidence to the contrary, a certification conforming to the statutory requirements is sufficient indicia of a valid certification. 609 N.W.2d at 877.

▮▮▮ LSPI argues that this presumption can be rebutted by the city assessor's lack of information, the testimony of the successor to the city assessor who certified the minimum market value, and the testimony of LSPI's expert. However, LSPI's first argument fails because the assessor's signed certification alone without rebuttal evidence indicates prima facia compliance with the statute. *Brookfield II,* 609 N.W.2d at 877–78. LSPI's second argument also fails because testimony from a subsequent assessor who was not involved with the original certification does little to illuminate whether the previous assessor actually performed the statutorily required analysis and is not probative of the narrow factual issues before the court. *Id.* at 877. LSPI's third argument fails as well because LSPI's expert testimony indicating a lower value is appropriate is also not probative as to the narrow issue before this court because the expert's testimony is based on a valuation method that differs from the method used by the assessor and

is not required by statute.[3] Because LSPI cannot rebut the presumption that the assessor's certification complied with the statute, we hold that the tax court did not err in determining that the assessor's certification satisfied the statutory requirements.

## V.

LSPI also argues that the tax court erred in failing to find any genuine issue of material fact as to the adjustment clause and assessor's certification issues. LSPI argues that their expert's opinions, combined with the admissions of Lynn Duncan, who is Young's predecessor, and Young himself, "created a genuine issue of material fact as to the reasonableness of Young's certification of value, precluding the entry of summary judgment in the City's favor." The tax court held as a matter of law that Young's estimate was not unreasonable at the time he certified the value, that the material facts were not in dispute, and that the evidence offered by LSPI to controvert the city assessor's testimony was not probative. It further pointed out that Young's failure to keep good records is not particularly relevant because this case involves a challenge to the validity of the assessment agreement and is not a valuation case.

Our standard of review in resolving this issue is to determine "whether there are any genuine issues of material fact." *Brookfield I*, 584 N.W.2d at 392–93. The only factual dispute raised by LSPI is that LSPI's expert valued the paper mill at $32,000,000 while Duncan certified that the $42,742,100 valuation negotiated and agreed upon by the parties was reasonable. However, the two values are based on different valuation formulas, and Young's analysis was completed before the paper mill site was completed while Ramsland's valuation was completed well after the paper mill was completed. As a result, the different values are not per se unreasonable as a matter of law. Moreover, the issue in the instant case is statutory compliance and not valuation. Ramsland's testimony does not raise a genuine issue of material fact because it is not probative as to whether the assessor complied with the relevant statute when he certified the reasonableness of the paper mill's minimum assessed value. We hold that the tax court did not err in holding that there were no issues of material fact.

Affirmed.

---

**3.** The tax court pointed out that "[i]f the certified estimate was so unreasonable, the Petitioner need not have agreed to the terms of the Assessment Agreement in the first place or could have challenged it long before now."

*Lake Superior Paper Indus. v. State*, Nos. CX–96–600516, C4–97–600649, C1–98–600621 2000 WL 204062 at *7 (Minn. T.C. Feb. 9, 2000).