# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A23-0664

Central Specialties, Inc.,
Respondent,

vs.

Minnesota Department of Transportation,
Appellant.

**Filed April 1, 2024**
**Affirmed in part, reversed in part**
**Johnson, Judge**
**Concurring in part, dissenting in part, Smith, John, Judge**[*]

Mahnomen County District Court
File No. 44-CV-19-137

Kyle E. Hart, Hugh D. Brown, Fabyanske, Westra, Hart & Thomson, P.A., Minneapolis, Minnesota (for respondent)

Keith Ellison, Attorney General, William Young, Andrew D. Gross, Assistant Attorneys General, St. Paul, Minnesota (for appellant)

Considered and decided by Johnson, Presiding Judge; Schmidt, Judge; and Smith, John, Judge.

## SYLLABUS

1.      The district court erred by denying appellant's post-trial motion for judgment as a matter of law because the evidence is insufficient to prove that appellant breached the implied covenant of good faith and fair dealing by refusing to fulfill a contractual duty or obligation based on an ulterior motive.

---

[*]Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

2.      The requirement that a state agency pay interest penalties to a vendor for untimely payments pursuant to Minnesota Statutes section 16A.124 (2022) applies to undisputed billings arising under a construction contract but does not apply to disputed claims under a construction contract.

## OPINION

**JOHNSON**, Judge

A Mahnomen County jury found that a state agency breached the implied covenant of good faith and fair dealing in connection with a road-construction contract. The district court denied the state agency's post-trial motion for judgment as a matter of law. The district court also concluded, based on stipulated facts, that the state agency did not timely make a payment to the contractor for one undisputed item and, thus, is liable to the contractor for statutory interest penalties. We conclude that the district court erred by denying the state agency's post-trial motion for judgment as a matter of law because the evidence is insufficient to prove that the state agency breached the implied covenant of good faith and fair dealing by refusing to fulfill a contractual duty or obligation based on an ulterior motive. We also conclude that the district court did not err by entering judgment in favor of the contractor on its claim for statutory interest penalties. Therefore, we affirm in part and reverse in part.

## FACTS

Central Specialties Inc. (CSI) is a Minnesota company engaged in the business of road construction. The Minnesota Department of Transportation (MnDOT) is the state

2

agency with responsibility for building and maintaining state highways. *See* Minn. Stat. § 174.01, subd. 1 (2022).

In November 2016, MnDOT sought bids for a mill-and-overlay project on a 36-mile segment of state highway 59 in Polk, Mahnomen, and Becker counties. CSI submitted the winning bid of approximately $9,800,000. In calculating its bid, CSI considered, among other things, the locations of the sources of its materials and the costs of transporting materials to the project site. MnDOT and CSI entered into a written contract in March 2017. The contract, which includes numerous standard specifications, had been made available to all bidders before bids were due.

A state statute provides that, if "the use of any public street or highway is necessary for a detour or haul road" during the construction or maintenance of a state highway, the commissioner of transportation "may designate" it a temporary state highway, during which time the commissioner "shall . . . maintain" it. Minn. Stat. § 161.25 (2022). Before revoking the designation of a public street or highway as a temporary state highway, "the commissioner shall restore such streets or highways to as good condition as they were prior to the designation of same as temporary trunk highways." *Id.*

The contract between MnDOT and CSI includes standard specification 1515, which addresses the designation of haul roads. That specification states, "The department may, but is not required to, designate haul roads in accordance with Minnesota Statutes § 161.25." Standard specification 1515 also states,

> If the department has not made a written designation of a haul road, then the contractor will be responsible for the following:

3

(1)    arranging for the use of roads not under the jurisdiction of the department,

(2)    performing any maintenance and restoration as required by the applicable road authority as a condition of use of such road as a haul road, and

(3)    paying any fees, charges, or damages assessed by the applicable road authority as a condition of using such road as a haul road.

Standard specification 1515 further states:

In preparing its proposal, *the contractor is not entitled to assume that the department will designate a haul road, or that the haul road designated will be the most convenient and direct route or not subject to reduced weight limits.* The department will not consider its decision to designate or not designate a requested haul route as a basis for a contract revision. (Emphasis added.)

The contract between MnDOT and CSI also includes standard specification 2051,

which addresses the maintenance and restoration of haul roads:

If the contract specifies maintenance and restoration of haul roads as a contract item, do not haul material from any source until the commissioner designates the haul road from that source as a haul road. Once the commissioner designates the haul road from a source, haul all materials from that source over that road.

. . . .

If the contract is with MnDOT for state trunk highway projects, select haul roads and notify the engineer of the selections. Within 15 calendar days after receipt of notification of the haul road selections, the commissioner will determine the acceptability of the selected haul roads. *If the haul roads are acceptable, the commissioner will designate the roads as temporary trunk highway haul roads*. (Emphasis added.)

4

In this case, CSI requested 13 haul roads at an April 26, 2017 pre-construction meeting with MnDOT. The Mahnomen County engineer, Jonathan Large, attended the meeting and expressed concerns about the use of three roads as haul roads: Mahnomen County highways 5, 6, and 10. Large was concerned about county highway 5 because it was "structurally showing signs of failing" and was "very soft" because of a wet fall. Similarly, Large was concerned about county highway 10 because it had "a couple spots . . . that were very suspect." Furthermore, Mahnomen County was planning to work on or reconstruct segments of county highways 5 and 10 that year, at a cost exceeding $1,000,000, during which time certain segments of highway 10 would be closed to the public. Large also was concerned about county highway 6 because he had observed "an accelerated degradation of the roadway" years earlier, which had caused him to impose a seven-ton weight limit on that road. Large did not express concerns about the other requested haul roads passing through Mahnomen County. CSI personnel were present when Large expressed his concerns at the pre-construction meeting. Large later asked MnDOT to enter into a written agreement that would specify the remedial work necessary to restore any damaged county roads, but MnDOT declined to enter into such an agreement.

Immediately after the pre-construction meeting, MnDOT's project supervisor, Ross Hendrickson, went to county highways 5, 6, and 10 to visually inspect them. The next day, Hendrickson sent an e-mail message to CSI to suggest another meeting to discuss haul roads. MnDOT and CSI met again on May 9, 2017. The day after that meeting, Hendrickson sent an e-mail message to CSI and Large to summarize the statements made at the meeting by MnDOT, CSI, and Large.

MnDOT then conducted additional inspections and technical testing on the three requested haul roads about which Mahnomen County had concerns. MnDOT's district engineer, Troy Strassburg, observed half-inch-deep rutting on county highway 6, which indicated to him that the road was not "holding its proper shape." On May 10 and 11, 2017, MnDOT tested county highways 5 and 6 with a falling-weight deflectometer,[1] which indicated that the roads were in a poor condition that would not allow a 10-ton weight limit.[2] On the same dates, MnDOT personnel also used a "pave tech van" to make video-recordings of the road surfaces and take measurements of cracking and rutting. Strassburg and Hendrickson reviewed the data gathered during testing, consulted with personnel at the MnDOT materials laboratory in the Twin Cities metropolitan area, and consulted with other MnDOT personnel. Strassburg determined that MnDOT would deny CSI's request to use county highways 5, 6, and 10 as haul roads without weight limits. Strassburg testified that he considered Large's views about the conditions of county highways 5, 6, and 10 but made an independent decision on CSI's request for haul roads.

On May 26, 2017, Hendrickson sent an e-mail message to inform CSI that MnDOT would unconditionally approve four of CSI's requested haul roads and would approve nine roads subject to weight limits. In pertinent part, Hendrickson's e-mail message states that

_____

[1]A falling weight deflectometer is a "hydraulic piece of equipment" that "bangs on the ground" to simulate 6,000- to 12,000-pound loads and contains sensors that "pick up the deflection in the road" to measure "how strong the road is." The measurements are analyzed by a computer program. The test is standard in the industry for testing the strength of roads.

[2]The tests on county highway 10 were performed, with similar results, on June 5, 2017, after Hendrickson had informed CSI of MnDOT's decision on its haul-roads request.

MnDOT approved the use of county highway 5 with a nine-ton weight limit, county highway 6 with a seven-ton weight limit, and county highway 10 with a nine-ton weight limit.

CSI performed its work on state highway 59 in the summer of 2017. After completing the project, CSI calculated that its inability to use all of its requested haul roads without weight limits resulted in additional hauling costs in the amount of approximately $490,000. CSI submitted a claim to MnDOT for those additional costs; MnDOT denied the claim.

CSI commenced this action in March 2019. CSI asserted three causes of action: breach of warranty, breach of contract, and violation of Minnesota Statutes section 16A.124, which requires state agencies to pay vendors promptly or incur interest penalties. In September 2019, MnDOT moved for summary judgment on all claims. The district court denied MnDOT's motion in March 2020. Before trial, however, the district court granted MnDOT's motion *in limine* to exclude evidence of a breach of warranty.

The case was tried to a Mahnomen County jury on four days in November and December of 2022. Only one claim was submitted to the jury: a claim of breach of contract based on an alleged breach of the implied covenant of good faith and fair dealing. MnDOT moved for judgment as a matter of law after CSI rested its case, and the district court denied the motion. The jury returned a verdict in favor of CSI and awarded damages of $490,100.34. MnDOT filed a renewed motion for judgment as a matter of law, which the district court denied in March 2023. MnDOT appeals.

7

## ISSUES

I.     Did the district court err by denying MnDOT's post-trial motion for judgment as a matter of law?

II.    Did the district court err by entering judgment in favor of CSI on its claim under Minnesota Statutes section 16A.124?

## ANALYSIS

## I.

MnDOT's primary argument is that the district court erred by denying its post-trial motion for judgment as a matter of law.

A party is entitled to judgment as a matter of law if "there is no legally sufficient evidentiary basis for a reasonable jury to find" for the other party on an issue. Minn R. Civ. P. 50.01(a). A party may move for judgment as a matter of law after a jury has returned a verdict. Minn. R. Civ. P. 50.02. On appeal, this court views the evidence in the light most favorable to the non-moving party. *Kidwell v. Sybaritic, Inc.*, 784 N.W.2d 220, 229 (Minn. 2010). We apply a *de novo* standard of review to a district court's ruling on a post-trial motion for judgment as a matter of law. *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 919 (Minn. 2009).

## A.

The jury's verdict is based on CSI's claim of breach of the implied covenant of good faith and fair dealing. The supreme court first recognized such a cause of action in *In re Hennepin County 1986 Recycling Bond Litigation*, 540 N.W.2d 494 (Minn. 1995), and described it as follows:

Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not "unjustifiably hinder" the other party's performance of the contract. *Zobel & Dahl Constr. v. Crotty*, 356 N.W.2d 42, 45 (Minn. 1984); *see also Haase v. Stokely-Van Camp, Inc.*, 99 N.W.2d 898, 902 (1959); Restatement (Second) of Contracts § 205 (1981). Similarly, we have held that the party to a contract cannot take advantage of the failure of a condition precedent when the party itself has frustrated performance of that condition. *Space Center*, 298 N.W.2d at 449; *Nodland v. Chirpich*, 240 N.W.2d 513, 516 (Minn. 1976).

*Id.* at 502-03. The supreme court explained in *Hennepin County* that the implied covenant of good faith and fair dealing "does not extend to actions beyond the scope of the underlying contract." *Id.* at 503. The supreme court also explained that a plaintiff alleging such a claim "need not first establish an express breach of contract claim" because the claim "implicitly assumes that the parties did not expressly articulate the covenant allegedly breached." *Id.*

Three years after the *Hennepin County* opinion, this court considered a claim of breach of the implied covenant of good faith and fair dealing based on the defendants' exercise of a contractual right to take certain actions "at [their] sole discretion." *Sterling Capital Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 123 (Minn. App. 1998) (alteration in original). We noted in our opinion that the supreme court had held that the cause of action "prevent[s] one party from unjustifiably hindering the other party's performance," but we also noted that the supreme court had "not yet ruled on" whether the cause of action restricts a party's right to exercise a contractual grant of "unlimited discretion." *Id.* at 125. We analyzed the parties' arguments by, in essence, assuming without deciding that the theory could restrict a party's exercise of contractually granted discretion. *See id.* We also noted,

9

"A party to a contract 'does not act in bad faith by asserting or enforcing its legal and contractual rights.'" *Id.* (quoting *Burgmeier v. Farm Credit Bank*, 499 N.W.2d 43, 50 (Minn. App. 1993), *rev. denied* (Minn. July 15, 1993)). We affirmed a grant of summary judgment for the defendants on the ground that its shareholders "legitimately considered" whether to accept offers to sell a business and "decided to exercise their contractual right to reject" all offers because they were "unacceptably low." *Id.* at 125, 127.

In the course of our analysis in *Sterling Capital*, we stated that bad faith "is defined as a party's refusal to fulfill some duty or contractual obligation based on an ulterior motive, not an honest mistake regarding one's rights or duties," *id.* at 125 (citing *Lassen v. First Bank*, 514 N.W.2d 831, 837 (Minn. App. 1994), *rev. denied* (Minn. June 29, 1994)), and that good faith means that a person's actions are "done honestly, whether it be negligently or not," *id.* (quoting Minn. Stat. § 520.01, subd. 6 (1996)). In subsequent opinions, we have restated *Sterling Capital*'s definitions of bad faith and good faith, including the reference to an ulterior motive. *See Minnwest Bank v. Flagship Props. LLC*, 689 N.W.2d 295, 303 (Minn. App. 2004); *Prairie Island Indian Cmty. v. Minnesota Dep't of Pub. Safety*, 658 N.W.2d 876, 889 (Minn. App. 2003).

**B.**

In this case, CSI sought to prove its claim on a narrow ground: that MnDOT withheld unconditional approval of three of CSI's requested haul roads based on an "ulterior motive." The district court gave the following jury instruction on the implied covenant of good faith and fair dealing:

10

A party breaches the duty of good faith and fair dealing when it refuses to fulfill a contractual obligation based upon an ulterior motive. Conduct that breaches the duty of good faith and fair dealing is conduct that is dishonest or malicious or in bad faith. The duty of good faith and fair dealing, however, cannot create obligations that are inconsistent with the terms of the contract.

In closing argument, CSI's attorney disclaimed any intention to prove a more conventional variety of bad faith:

Central Specialties does not contend or believe that MnDOT acted fraudulently. . . . We also don't believe they acted dishonestly. We also don't believe they acted in bad faith, if bad faith is defined as acting with an evil intent, or with an intent to intentionally harm somebody. That's not what happened here.

What CSI contends, and what the evidence in this case proves beyond any doubt, is that MnDOT's decision not to approve Central Specialties' requested haul roads was inconsistent with and contrary to the parties' thirty-plus-year course of dealing. And here's the part where you get the good faith or the bad faith. And MnDOT's decision was improperly influenced by a long running dispute between MnDOT and not only Mr. Large and Mahnomen County, it was all, all the counties.

CSI's attorney argued that MnDOT often damages haul roads without repairing them, that Mahnomen County wanted assurance that MnDOT would repair any damage caused by this project, that CSI "found itself in the middle of this dispute," and that MnDOT withheld unconditional approval of three of CSI's requested haul roads to avoid a dispute with Mahnomen County, contrary to MnDOT's past practice of routinely approving contractors' requested haul roads. CSI's attorney summarized by stating:

So you have everything you need to know right there. MnDOT was not acting in accordance with the thirty-year history. *They*

11

*were acting for an ulterior purpose.* They were trying to placate Mr. Large, and that is not Central's fault. And under the instructions that the judge will give you, that constitutes a breach of the duty of good faith and fair dealing . . . . (Emphasis added.)

## C.

MnDOT challenges the district court's denial of its post-trial motion for judgment as a matter of law on multiple grounds.

First, MnDOT contends that CSI's evidence is insufficient as a matter of law because the contract governing the parties' relationship gave MnDOT broad discretion to approve or disapprove CSI's requested haul roads. MnDOT asserts that "when one party exercises its contractual discretion, that exercise alone cannot constitute a breach of the implied covenant." In support of this contention, MnDOT cites a decision of a federal district court, which reasoned that the implied covenant of good faith and fair dealing "is breached only by conduct that is dishonest or malicious or otherwise in subjective bad faith." *BP Prods. N. Am., Inc. v. Twin Cities Stores, Inc.*, 534 F. Supp. 2d 959, 965 (D. Minn. 2007). In response, CSI cites a different decision of a federal district court, which reasoned that a party with a contractual grant of discretion must "exercise good faith in exercising an unlimited discretionary power over a term of the contract if necessary to effectuate the parties' intent and to save a contract from being held to be illusory." *White Stone Partners, LP v. Piper Jaffray Cos.*, 978 F. Supp. 878, 882 (D. Minn. 1997). We note that decisions of a federal district court on a matter of Minnesota law are not binding on a Minnesota state court. *See Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321, 330 (Minn. 2000).

12

In *Sterling Capital*, we stated that the supreme court had not ruled on whether the implied covenant of good faith and fair dealing restricts a party's exercise of a contractual grant of discretion. 575 N.W.2d at 125. We assumed without deciding that a party must exercise good faith in exercising such discretion, *i.e.*, that a party must exercise such discretion in a manner consistent with the implied covenant of good faith and fair dealing. *Id.* (citing *White Stone*, 978 F. Supp. at 882). But we also stated, "A party to a contract 'does not act in bad faith by asserting or enforcing its legal and contractual rights.'" *Id.* (quoting *Burgmeier*, 499 N.W.2d at 50).

Three years later, the supreme court analyzed a claim of breach of the implied covenant of good faith and fair dealing that was based on an allegation that a defendant unreasonably withheld its agreement to a request to modify a contract—a request that the defendant apparently had no contractual duty to consider. *See Lake Superior Paper Indus. v. State*, 624 N.W.2d 254, 258-59 (Minn. 2001). The supreme court did not comment on whether the defendant's inherent discretion to agree or not agree to a contract modification affected the viability of the plaintiff's claim. *Id.* In light of *Sterling Capital* and *Lake Superior Paper*, we again assume without deciding that the implied covenant of good faith and fair dealing applies to a contractual grant of discretion.

Second, MnDOT contends that evidence of an "ulterior motive" does not establish a breach of the implied covenant of good faith and fair dealing on the ground that no precedential opinion has incorporated the "ulterior motive" concept into the implied covenant of good faith and fair dealing. In *Sterling Capital*, we defined bad faith to include "a party's refusal to fulfill some duty or contractual obligation based on an ulterior motive,

13

not an honest mistake regarding one's rights or duties." 575 N.W.2d at 125 (citing *Lassen*, 514 N.W.2d at 837). In subsequent opinions, we have restated *Sterling Capital*'s definitions of bad faith and good faith, including the reference to ulterior motive, thereby indicating that a plaintiff may prove a claim of breach of the implied covenant of good faith and fair dealing with evidence of an ulterior motive. *See Minnwest Bank*, 689 N.W.2d at 303; *Prairie Island Indian Cmty.*, 658 N.W.2d at 889. These opinions are binding on this court and on the district courts. *See State v. M.L.A.*, 785 N.W.2d 763, 767 (Minn. App. 2010), *rev. denied* (Minn. Sept. 21, 2010).

Third, MnDOT contends that the evidence in this case is simply insufficient to prove that it breached the implied covenant of good faith and fair dealing by refusing to fulfill a contractual duty or obligation based on an ulterior motive. We understand the word "ulterior" to mean, "Lying beyond what is evident, revealed, or avowed, especially being concealed intentionally so as to deceive; *ulterior motive*." *The American Heritage Dictionary of the English Language* 1880 (5th ed. 2018).

As an initial matter, we must consider whether MnDOT refused to fulfill a contractual obligation. *See Sterling Capital*, 575 N.W.2d at 125. MnDOT was contractually obligated to "determine the acceptability of the selected haul roads" that were requested by CSI. MnDOT made such a determination. CSI's claim is based on the fact that MnDOT did not approve CSI's request in its entirety but, instead, approved CSI's use of county highways 5, 6, and 10 as haul roads subject to certain weight limits. MnDOT was not contractually obligated to unconditionally approve CSI's request to use county highways 5, 6, and 10 as haul roads. Rather, the contract states, "If the haul roads are

14

acceptable, the commissioner will designate the roads as temporary trunk highway haul roads." As stated above, we assume that the implied covenant of good faith and fair dealing applies to that discretionary decision. *See Lake Superior Paper*, 624 N.W.2d at 259; *Sterling Capital*, 575 N.W.2d at 125.

To the extent that CSI's claim is based on the theory that MnDOT was improperly influenced by Mahnomen County's concerns about possible damage to county highways, CSI's evidence does not reveal bad faith in the form of an ulterior motive. The record shows that Mahnomen County was concerned about maintaining the conditions of three of its county highways and tried to ensure that any damage caused by the work on state highway 59 would be remedied. CSI does not argue that Large was anything other than genuine in advocating for his employer, the county. In light of the concerns expressed by Mahnomen County, MnDOT was legitimately concerned about the possibility that MnDOT might become responsible, pursuant to statute, for repairing any damaged roads that were used as haul roads by CSI. *See* Minn. Stat. § 161.25. At trial, CSI characterized MnDOT's concerns as an ulterior motive. On appeal, CSI contends that MnDOT "acted with an ulterior motive to benefit itself by avoiding a confrontation with" Large and Mahnomen County. We agree with CSI that the evidence is capable of proving that MnDOT's concerns about potential damage to the county's roads motivated MnDOT's decision to not unconditionally approve all of CSI's requested haul roads. But such a motive is not an ulterior motive, nor is it evidence of bad faith.

MnDOT did not simply acquiesce to the county's expressed concerns. MnDOT engaged in an independent study of the condition of county highways 5, 6, and 10 and the

15

likelihood that those roads would be damaged by CSI's use of them as haul roads. MnDOT took multiple steps to gather and analyze information before determining whether county highways 5, 6, and 10 were acceptable haul roads. Both Hendrickson and Strassburg visually inspected CSI's proposed haul roads. MnDOT performed technical tests, which generated objective measurements of the conditions of the roads. MnDOT's final decision was nuanced in that it approved four of CSI's 13 requested roads without qualification, approved nine roads subject to weight limits, and did not completely deny any requested haul road. MnDOT's final decision was well within its contractual authority.[3] As we stated in *Sterling Capital*, "A party to a contract does not act in bad faith by asserting or enforcing its legal and contractual rights." 575 N.W.2d at 125 (quotation omitted).

Furthermore, both Mahnomen County and MnDOT were transparent about their respective concerns. CSI personnel attended the pre-construction meeting at which Large, on behalf of the county, openly stated his concerns about some of CSI's requested haul roads. Thereafter, Hendrickson kept CSI apprised by e-mail and oral conversations. CSI

---

[3]Our dissenting colleague suggests that the jury's verdict may be justified on the ground that MnDOT did not use "engineering judgment." *See infra* C/D-2. But that was not CSI's theory of the case at trial. CSI's attorney did not mention the issue in a 45-page closing argument except to respond briefly to MnDOT's reference to it and only to say that "past experiences" is one of the factors relevant to engineering judgment. The district court did not give the jury an instruction on the issue of engineering judgment. Rather, the district court instructed the jury that the contract gave MnDOT authority to approve requested haul roads and to determine whether requested haul roads were acceptable. On appeal, CSI takes the position that the "engineering judgment" provision in standard specification 1501 is irrelevant. We agree with CSI on that point. The subject of haul roads is governed by standard specifications 1515 and 2051.

does not argue that MnDOT concealed the possibility that it might disapprove of CSI's request to use county highway 5, 6, and 10 as haul roads without weight limits.

To the extent that CSI's claim is based on the theory that MnDOT's final decision on its requested haul roads is contrary to MnDOT's past practice, CSI's evidence still does not reveal bad faith in the form of an ulterior motive. CSI contends that, when bidding on the project, it had an expectation, based on prior experience, that MnDOT would approve all of its requested haul roads.[4] But CSI's expectation is inconsistent with the express terms of the parties' contract, which provides merely that MnDOT "may, but is not required to, designate haul roads in accordance with Minnesota Statutes § 161.25." More importantly, the contract provides, "In preparing its proposal, *the contractor is not entitled to assume that the department will designate a haul road, or that the haul road designated will be the most convenient and direct route or not subject to reduced weight limits*." (Emphasis added.) In light of these provisions, CSI expressly assumed the risk that MnDOT might disapprove of some of its requested haul roads.

This case is analogous to *Sterling Capital*, in which the defendant retained discretion under a contract to accept or reject offers for the purchase of its business and rejected all offers that were presented. 575 N.W.2d at 123-24. The plaintiff sought "to restrict the [defendants'] unlimited discretion in the contract . . . by imposing the implied covenant of good faith and fair dealing onto the right to reject clause." *Id.* at 125. We concluded that

_____

[4]Several witnesses testified that they did not have personal experience with the denial of a contractor's requested haul roads. Strassburg testified that MnDOT had denied a contractor's requested haul roads in 2016, only one year before it denied CSI's requested haul roads for this project.

17

the plaintiff's evidence was insufficient as a matter of law because the defendants "legitimately considered" third-party offers, found that all such offers were "unacceptably low," and "decided to exercise their contractual right to reject" all offers. *Id.* The *Sterling Capital* opinion demonstrates that a party exercising discretionary decision-making authority pursuant to a contract does not breach the implied covenant of good faith and fair dealing simply because the party makes a decision that is motivated by its own interests. That is what MnDOT did in this case.[5]

Thus, CSI's evidence is insufficient as a matter of law to prove that MnDOT breached the implied covenant of good faith and fair dealing because of an ulterior motive. Therefore, the district court erred by denying MnDOT's post-trial motion for judgment as a matter of law.

**II.**

MnDOT also argues that the district court erred by entering judgment for CSI on its claim under section 16A.124 of the Minnesota Statutes.

---

[5]Our dissenting colleague attempts to distinguish *Sterling Capital* on the ground that it was decided on a motion for summary judgment. *See infra* C/D-5. But the question on a post-trial motion for judgment as a matter of law is the same as the question on a motion for summary judgment: whether a party is entitled to judgment as a matter of law. *Compare* Minn. R. Civ. P. 50.01(a), 50.02, 50.02(a)(3) *with* Minn. R. Civ. P. 56.01. The United States Supreme Court repeatedly has stated that the standard for a post-trial motion for judgment as a matter of law "mirrors" the standard for a motion for summary judgment. *Dupree v. Younger*, 598 U.S. 729, 731 (2023); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986).

## A.

The general rule of section 16A.124 is stated in subdivision 3:

> State agencies must pay each valid vendor obligation so that the vendor receives payment within the vendor's early payment discount period. If there is no early payment discount period, the state agency must pay the vendor within 30 days following the receipt of the invoice for the completed delivery of the product or service.

Minn. Stat. § 16A.124, subd. 3. If a state agency does not pay a vendor within the required time period, the agency is subject to consequences specified in subdivision 5, which provides in relevant part:

> A state agency shall pay interest to a vendor for undisputed billings when the agency has not paid the billing within 30 days following receipt of the invoice, merchandise, or service whichever is later. . . . Before any interest payment is made, the vendor must invoice the state agency for such interest. For a construction contract utilizing partial payments based on an engineer's estimate or a payment application approved by an architect, an invoice includes an engineer's estimate or a payment application, as applicable, if made in regular intervals that are: (1) as specified in the contract, and (2) no less frequent than once per month.

*Id.*, subd. 5(a). "The rate of interest paid by the agency on undisputed bills not paid within 30 days shall be 1-1/2 percent per month or any part thereof." *Id.*, subd. 5(b).

Subdivision 5 also contains an exception to the consequences specified in subdivision 5(a):

> No interest penalties may accrue against an agency that delays payment of a bill due to a disagreement with the vendor; provided, that the dispute must be settled within 30 days after the bill became overdue. Upon the resolution of the dispute, the agency must pay the vendor accrued interest on all proper invoices for which payment was not received within the

19

applicable time limit contained in subdivision 3. No interest penalties accrue under this section against an agency for claims made by a contractor under a construction contract.

*Id.*, subd. 5(e).

**B.**

After completing its work under the contract, CSI sought payment of the contract price and also made several claims for additional compensation. On February 4, 2019, MnDOT and CSI agreed that MnDOT would pay CSI an additional amount of $181,023.70. MnDOT made the payment to CSI on May 20, 2019, which was 75 days after the parties' agreement on the payment.

CSI commenced this action on March 5, 2019, during the interval between the parties' agreement and MnDOT's payment. In count 3, CSI pleaded a claim under section 16A.124, alleging that MnDOT did not make a prompt payment and, thus, owes CSI interest penalties. MnDOT moved for summary judgment on count 3 on the ground that, in light of the last sentence of subdivision 5(e), section 16A.124 does not apply to any payments due under a construction contract. In opposing the motion, CSI argued that the last sentence of subdivision 5(e) makes an exception only for "claims," *i.e.*, disputed claims, but that subdivision 5(a) requires the payment of interest penalties for the untimely payment of "undisputed billings." The district court agreed with CSI's interpretation of the statute, determined that the parties had agreed on a payment of $181,023.70, and denied MnDOT's summary-judgment motion on that claim.

Before trial, the parties agreed that count 3 should be tried to the court on stipulated facts. The parties further agreed that, if section 16A.124 applies, judgment should be

20

entered in favor of CSI on count 3 in the amount of $6,652.62. In its post-trial order for judgment, the district court concluded that section 16A.124 applies and entered judgment for CSI in the agreed-upon amount.

**C.**

On appeal, the parties renew their legal arguments. MnDOT argues that the act does not apply to any payment arising under a construction contract.[6] CSI argues that the act applies to payments of undisputed billings but does not apply to disputed claims.

The parties' arguments require us to interpret the statute. The first step in interpreting a statute "is to determine whether the statute's language, on its face, is ambiguous." *State v. Thonesavanh*, 904 N.W.2d 432, 435 (Minn. 2017). "'A statute is ambiguous only if it is subject to more than one reasonable interpretation.'" *Id.* (quoting *500, LLC v. City of Minneapolis*, 837 N.W.2d 287, 290 (Minn. 2013)). To determine whether the statute is ambiguous or unambiguous, we look to "the common and ordinary meanings" of the words used. *Id.* at 436. If we conclude that a statute is unambiguous, "then we must apply the statute's plain meaning." *State v. Nelson*, 842 N.W.2d 433, 436 (Minn. 2014) (quotation omitted).

---

[6]The rules of appellate procedure give parties the option of including a statement in a brief as to whether the court's opinion should be either precedential or non-precedential. Minn. R. Civ. App. P. 128.02, subd. 1(f). MnDOT states in its principal brief that this issue has not been resolved by an appellate opinion, that the court's interpretation of section 16A.124 will have statewide impact, and that the court should issue a precedential opinion. At oral argument, CSI agreed that the court's opinion should be precedential. We appreciate the parties' input.

MnDOT's argument—that section 16A.124 does not apply to any payment made under a construction contract—is inconsistent with the plain language of section 16A.124. We must "'construe a statute as a whole and interpret its language to give effect to all of its provisions.'" *State v. Prigge*, 907 N.W.2d 635, 638 (Minn. 2018) (quoting *State v. Riggs*, 865 N.W.2d 679, 683 (Minn. 2015)). Another subdivision of section 16A.124 provides that the statute generally applies "to all agency purchases, leases, rentals, and contracts for services, including *construction and remodeling contracts*." Minn. Stat. § 16A.124, subd. 8 (emphasis added). The existence of such language in another subdivision indicates that section 16A.124 has some application to construction contracts, else that reference to construction contracts would be mere surplusage. *See State v. Galvan-Contreras*, 980 N.W.2d 578, 585 (Minn. 2022).

The exception in the last sentence of subdivision 5(e) must be understood in the context of that paragraph. *See State v. Loveless*, 987 N.W.2d 224, 250 (Minn. 2023). The first sentence of the paragraph makes an exception for the situation in which "an agency that delays payment of a bill due to a disagreement with the vendor." Minn. Stat. § 16A.124, subd. 5(e). The second sentence of the paragraph provides that an agency must pay a vendor interest "on all proper invoices" within 30 days after "the resolution of the dispute." *Id.* Although the words "bill" and "invoices" are used in the first and second sentences of subdivision 5(e), a different word —"claim"—is used in the last sentence. The word "claim" is commonly understood to indicate a request or demand that is subject to a dispute or disagreement. *See, e.g.*, *Black's Law Dictionary* 311 (11th ed. 2019) (defining "claim" to mean "statement that something yet to be proved is true" or "assertion

22

of an existing right"). Thus, it is apparent that the last sentence of subdivision 5(e) precludes the imposition of interest penalties under section 16A.124 on a disputed "claim" that is "made by a contractor under a construction contract" but not on a "bill" or "proper invoice[]." Consequently, the last sentence of subdivision 5(e) does not affect a state agency's obligation to pay interest penalties pursuant to subdivision 5(a) on an untimely payment of an "undisputed billing" under a construction contract.

### D.

In this case, MnDOT and CSI entered into an agreement on February 4, 2019, that MnDOT would pay CSI additional compensation of $181,023.70. As of that date, MnDOT's obligation to pay CSI was an undisputed billing for purposes of subdivision 5(a). Thus, the district court did not err by concluding that section 16A.124 applies and that CSI is entitled to judgment in the amount of the interest penalties due under subdivision 5(a).

### DECISION

The district court erred by denying MnDOT's post-trial motion for judgment as a matter of law. The district court did not err by entering judgment for CSI on its claim under section 16A.124.

**Affirmed in part, reversed in part.**

23

**SMITH, JOHN** Judge (concurring in part, dissenting in part)

I concur with Part II of the majority opinion, with respect to the payment of statutory interest. I respectfully dissent from Part I of the majority opinion because I would affirm the district court's denial of judgment as a matter of law.

"A court may grant judgment as a matter of law if 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 220 (Minn. 2014) (quoting Minn. R. Civ. P. 50.01(a)). The evidence must be viewed in the light most favorable to the jury's verdict. *Id.* "When the district court has denied a motion for judgment as a matter of law, [an appellate court] *must* affirm if, in the record, there is *any* competent evidence reasonably tending to sustain the verdict." *Id.* (emphasis added).

Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing. *In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W. 2d 494, 562 (Minn. 1995). Without objection from appellant Minnesota Department of Transportation (MnDOT), the district court instructed the jury in this case that:

> When exercising its authority under a contract, a party is bound by a duty of good faith and fair dealing, which requires that one party not unjustifiably hinder the other party's performance of the contract. A party breaches the duty of good faith and fair dealing when it refuses to fulfill a contractual obligation based upon an ulterior motive. Conduct that breaches the duty of good faith and fair dealing is conduct that is dishonest or malicious or in bad faith. The duty of good faith and fair dealing, however, cannot create obligations that are inconsistent with the terms of the contract.

Having been so instructed, the jury returned a special verdict finding that MnDOT breached its contract with Central Specialties, Inc. (CSI).

When MnDOT moved for judgment as a matter of law, the district court judge used the proper standard for denying the posttrial motion for judgment as a matter of law. He analyzed the evidence in the light most favorable to the verdict and determined that:

> the jury could reasonably find that MNDOT did not use "engineering judgment" as required by the contract, in deciding if the haul roads were acceptable and instead acted to placate [the county engineer]. Since the jury could conclude from the facts that MNDOT acted with an ulterior motive. MNDOT's motion for judgment as a matter of law pursuant to Minn. R. Civ. P. 50.02 is denied.

I agree with the district court that the evidence presented at trial supports the jury's verdict.

A central exhibit for the jury's consideration was the contract between MnDOT and CSI. Under one provision of the contract, MnDOT had discretion to determine the acceptability of haul roads. But other provisions of the contract required MnDOT to use "engineering judgment" in making decisions regarding the "manner of performance and rate of progress of the work." Viewing the contract as a whole, the jury could reasonably have found that the implied covenant required MnDOT to base its haul-road decisions on the condition of the roads—i.e., use engineering judgment. CSI's theory in this case was that MnDOT breached the covenant of good faith and fair dealing by denying requested haul roads based on the ulterior motive of avoiding conflict with the county. There was evidence at trial that supported this theory.

The jury heard evidence that the county's reason for opposing the use of county roads for haul roads was MnDOT's refusal to provide a guarantee that the roads would be

C/D-2

fixed if damaged. County engineer Jonathan Large explained that it was not a matter of whether the roads were acceptable but rather whether MnDOT would give the guarantee:

> Q: . . . You wanted the roads fixed. You wanted a guarantee that if the roads were not, were damaged during the hauling process, they were gonna get fixed, and you wanted a guarantee from MnDOT?
> A: Basically that they would be returned to us in a like condition.
>
> Q: Right. And MnDOT was not willing to give you that were they?
> A: Not at the time, no.
>
> Q: And they never gave you that guarantee?
> A: No, they didn't.
>
> Q: And that was something you were asking of MnDOT, not of Central Specialties?
> A: Correct.
>
> Q: And as a result of that, isn't it true that you left your road restrictions until the Central Specialties' project was over?
> A: Yes.
>
> Q: And because MnDOT wouldn't designate them as haul roads, that meant that Central Specialties couldn't use 'em?
> A: They could use 'em, they'd just have to abide by those load restrictions.

The jury also heard evidence that MnDOT's decision to reject the proposed haul roads was influenced by the county's demands. CSI's project manager testified that the only reason MnDOT gave for denial of the requested haul roads was the county continuing its weight restrictions on them. MnDOT engineer Troy Strassburg initially testified that MnDOT's decision was not influenced by county demands, but he was impeached on cross-examination with his contradictory prior deposition testimony. During his

deposition, when asked whether "MnDOT's decision was influenced by [the county's] decision," Strassburg answered, "Yes, it probably was." Strassburg also agreed that "[i]t would not be appropriate for MnDOT to be influenced by [the county's] decision, if [that] decision was motivated by a desire to negotiate damages in advance[.]" And MnDOT project supervisor Ross Hendrickson testified that MnDOT conducted testing that supported the decision not to approve the requested haul roads, but he also conceded that MnDOT denied the haul roads *before* that testing was complete.

In addition to the testimony about the haul roads decision in this case, the jury heard testimony from several witnesses regarding MnDOT's general approach to approving haul roads. Strassburg and another MnDOT engineer testified that, in their experience, MnDOT had never previously denied a contractor's requested haul roads. There was also testimony that reflected longstanding disagreement between counties and MnDOT over how MnDOT compensates them for the use of their roads.

Taken together, the evidence at trial provided circumstantial evidence from which the jury could infer that MnDOT had an ulterior motive for denying CSI's requested haul roads. *See Weese v. Weese*, 254 N.W. 816, 818 (Minn. 1934) (observing that, "in most cases . . . bad faith must be proved by circumstantial evidence—by reasonable inferences drawn from facts and circumstances shown"); *cf. White Stone Partners, LP v. Piper Jaffray Cos.*, 978 F. Supp. 878, 885 (D. Minn. 1997) (discussing circumstantial evidence supporting inference that party was dishonest in invoking discretionary contractual clause).

The majority relies on this court's decision in *Sterling Capital Advisors, Inc. v. Herzog*, 575 N.W.2d 121 (Minn. App. 1998). But *Sterling* is distinguishable both factually

and in its procedural posture. Factually, the contract in *Sterling* placed no constraints on the right of shareholders to reject purchase offers sourced by Sterling, a broker. 575 N.W.2d at 124 ("Sterling drafted that clause which, by its plain language, gave the shareholders the unlimited discretion to reject any and all offers."). We reasoned that the shareholders "legitimately considered the offers to purchase the bank, but, finding the bids unacceptably low, decided to exercise their contractual right to reject." *Id.* at 125. In other words, there was no evidence of bad faith, i.e., an ulterior motive, in *Sterling*. *Id.* In contrast here, there was evidence presented at trial that MnDOT's decision to deny CSI's requested haul roads was based on the ulterior motive of placating the county.

Procedurally, *Sterling* was decided on summary judgment, before any jury had been empaneled to hear a claim. *Id.* at 124. In this case, the district court denied MnDOT's motion for summary judgment, and a trial was held. The nuances in the law are much like the colors of the rainbow, i.e., not always clearly a distinct color. It is when colors are not distinct that we call upon a jury to determine the facts in a case so that the law may be properly applied. In this case, the jury—having heard the evidence and exercising its sole province to weigh the credibility of the testifying witnesses—found that MnDOT breached the implied covenant of good faith and fair dealing by denying CSI's requested haul roads. Because there was a "legally sufficient evidentiary basis" for the jury to make this finding, I conclude that the district court properly denied MnDOT's motion for judgment as a matter of law. Minn. R. Civ. P. 50.01(a). I would therefore affirm the district court's judgment in its entirety.